# **EXHIBIT I**

COOLEY LLP
William V. O'Connor (216650)
(woconnor@cooley.com)
Alexander R. Miller (294474)
(amiller@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

Dane R. Voris (281051)
(dvoris@cooley.com)
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

BROWN & BROWN, INC.
Mark E. King (*admitted pro hac vice*)
Chief Litigation Counsel
(MEKing@bbins.com)
220 South Ridgewood Avenue
Daytona Beach, FL 32115
Telephone: (386) 239-5782
Facsimile: (386) 239-5729

Attorneys for Plaintiff and Counterclaim-Defendant
AMERICAN CLAIMS MANAGEMENT, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CLAIMS MANAGEMENT, INC., | Case No.  3:18-cv-00925-JLS-MSB |
| Plaintiff and Counterclaim-Defendant, | **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT AND TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| v. | |
| ALLIED WORLD SURPLUS LINES INSURANCE COMPANY (f/k/a/ Darwin Select Insurance Company) | **JURY TRIAL DEMAND** |
| Defendant and Counterclaimant. | |

Plaintiff American Claims Management, Inc. ("ACM"), by and through its counsel, for its First Amended Complaint against Defendant Allied World Surplus Lines Insurance Company, f/k/a Darwin Select Insurance Company ("Allied World"), alleges as follows:

**NATURE OF ACTION**

1.    ACM's professional-liability insurer, Allied World, acted in bad faith toward ACM, breached its contractual obligations under the insurance policy issued to ACM by failing to provide ACM with a proper defense in an underlying dispute, and failed to honor its contractual duties to fully indemnify ACM.  Allied World breached its duties by mishandling a claim against ACM at various stages and failing to settle within ACM's policy limits—despite having multiple reasonable opportunities to do so. Allied World's contractual breaches and its breaches of the implied covenant of good faith and fair dealing left ACM exposed to significant liability, and led to a multi-million-dollar arbitration award being entered against ACM, which Allied World then declined to satisfy in full.

2.    Allied World completely failed to provide its insured, ACM, with an adequate legal defense as required under the terms of the policy.  Rather, in the underlying dispute, it appointed and controlled an incompetent attorney (one of Allied World's panel counsel) for ACM, whose bungled strategy significantly increased the value of the underlying claim, thus increasing ACM's exposure.  ACM was ultimately forced to fire Allied World's appointed panel counsel when he continually put Allied World's interests above ACM's.  The underlying dispute ultimately proceeded to an arbitration against ACM, where Allied World continued to miss multiple reasonable opportunities to settle, despite numerous written and oral reports from ACM's replacement defense counsel recommending settlement and warning Allied World of the risks of a judgement in excess of policy limits.  Such an award was ultimately entered against ACM.

1    3.    ACM promptly presented the arbitration award to Allied World for

2  indemnity. Allied World continually delayed in its responsibilities to pay the award,

3  resulting in the accruing of interest for each passing day that the judgment remained

4  unsatisfied. Begrudgingly, and subject to another reservation of rights, Allied World

5  belatedly forwarded its policy limits, though these limits only partially funded the

6  judgment. At least $4.9 million of the judgment remains unfunded.

7    4.    ACM has also been forced to incur more than $1.1 million in fees and

8  expenses relating to defense costs incurred in connection with the arbitration, the costs

9  of the appellate bond that ACM was forced to file, and attorney fees incurred in

10  connection with its ongoing coverage dispute with Allied World—all of which remain

11  unreimbursed. Allied World claims that it does not owe anything more than its policy

12  limits, despite the fact that its actions (a) significantly increased the value of the

13  underlying claim and the resulting exposure faced by ACM and (b) caused ACM to

14  incur additional fees and expenses in connection with the underlying claim, the

15  arbitration, and ACM's continuing efforts to receive the full benefits of its policy.

16    5.    Allied World's violations of its statutory, contractual, and common-law

17  obligations exposed ACM to an arbitration award in excess of its policy limits and have

18  left ACM with no choice but to turn to the Court for relief. Accordingly, ACM brings

19  this action for breach of contract, tortious breach of the implied duty of good faith and

20  fair dealing, and an order that Allied World must indemnify ACM in full in connection

21  with the underlying matters. ACM seeks to recover compensatory, exemplary, and

22  punitive damages caused by Allied World's violations of its statutory, contractual, and

23  common-law duties for failing in its duties to defend and indemnify and for its bad faith

24  mishandling of this claim.

25                        **THE PARTIES**

26    6.    ACM is and was at all relevant times a California corporation doing

27  business in the State of California, San Diego County, with its headquarters located in

28  Carlsbad, California.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

3.

7.    Allied World is an insurance company organized under the laws of the State of Arkansas, with its principal place of business in New York, New York. Allied World is authorized to and does conduct business in the State of California. Upon information and belief, Allied World was known as Darwin Select Insurance Company until about June of 2014.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332, based on complete diversity of citizenship among the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

9.    The Court has personal jurisdiction over Allied World because it conducts business in and has sufficient contacts with California, including in this District. Among other contacts, Allied World issued an insurance policy to ACM that was made and delivered to ACM in this District.

10.    Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to ACM's claims occurred in this District. The insurance policy at issue was made and delivered in this District; ACM's claims against Allied World are related to an arbitration filed in this District; and ACM was injured in this District when Allied World breached its obligations under its insurance policy to ACM.

## FACTUAL BACKGROUND

### A.  The Allied World Primary Insurance Policy

11.    Allied World, then known as Darwin Select Insurance Company, issued ACM a claims-made Professional Liability Insurance Policy, No. 0304-9994, covering the policy period of October 1, 2010 to October 1, 2011 (the "Primary Policy"). A copy of the Primary Policy is attached hereto as **Exhibit A**.

12.    The Primary Policy requires Allied World to pay on behalf of ACM all "Loss and Defense Expenses in excess of the applicable Retention from any Claim first made against the Insured and reported to the Insurer during the Policy Period or any

1  applicable Extended Reporting Period, for a Professional Services Wrongful Act

2  committed on or after the applicable Retroactive Date and before the end of the Policy

3  Period." (Primary Policy § I. (A), as amended by Endorsement 5.)

4    13.    "Professional Services Wrongful Act" means, in relevant part, any actual

5  or alleged "[n]egligent act, error, omission, misstatement, misleading statement, neglect

6  or breach of duty . . . in the performance of or failure to perform Professional Services."

7  (Primary Policy § III. (S).)   Professional Services means, in relevant part, "services

8  performed by an Insured for others . . . in the usual and customary conduct of the

9  Profession [of a Third Party Claims Administrator] for a fee or other business

10  consideration . . . ." (Primary Policy § III. (R), Declaration Item 5.)

11    14.    The Primary Policy has a per Claim and Aggregate Limit of Liability of

12  $5,000,000 for Loss and Defense Expenses.   (Primary Policy, Declaration Item 3, as

13  amended by Endorsement 5.)   The Primary Policy also has a per Claim retention of

14  $100,000.   (Primary Policy, Declaration Item 4.)   "Loss" is defined as "damages, pre-

15  judgment interest, post-judgment interest, judgments, settlements, or other amounts that

16  an Insured is legally obligated to pay as a result of a Claim." (Primary Policy § III. (N),

17  as amended by Endorsement 6.)   "Defense Expenses" are defined as "reasonable legal

18  fees and expenses incurred by or on behalf of the Insured in the defense or appeal of a

19  Claim . . . ; provided that Defense Expenses will not include the Insured's overhead

20  expenses or any salaries, wages, fees or benefits of any natural person Insured.   Defense

21  Expenses shall include the cost of any bond or appeal required in any civil suit; provided

22  that the Insurer shall not be obligated to apply for or furnish any such bond." (Primary

23  Policy § III. (F).)

24    15.    The Primary Policy defines "Claim" to include "any written demand for

25  monetary, non-monetary or injunctive relief" and "any arbitration proceeding."

26  (Primary Policy § III. (C).)

27    16.    The Primary Policy provides: "As part of, and subject to, the Limits of

28  Liability . . . the Insurer has the right and duty to defend any Claim for a Professional

1    Services Wrongful Act which is covered in whole or in part under the Policy, even if

2    such Claim is groundless, false or fraudulent." (Primary Policy § I. (A), as amended by

3    Endorsement 5.)

4         17.    The Primary Policy further provides:  "The Insurer will have the right to

5    make investigations and conduct negotiations, and, with the consent of the Insured

6    which shall not be unreasonably withheld, enter into such settlement of any Claim as

7    the Insurer deems appropriate." (Primary Policy § V. (C)(1).)  Under the terms of the

8    Primary Policy only the Insurer (and not the Insured) can investigate, negotiate, and

9    settle a claim.   In fact, the Primary Policy goes a step further and has a punitive

10   provision, referred to in the insurance industry as a "hammer clause."  If the Insured

11   fails to agree with the Insurer on terms of the settlement that the Insurer negotiated,

12   according to the terms of the Primary Policy, the Insured will suffer financial

13   consequences: "If the Insured refuses to consent to a settlement acceptable to the

14   claimant in accordance with the Insurer's recommendation, then, subject to the

15   applicable Limit of Liability, the Insurer's liability for such Claim will not exceed the

16   amount for which such Claim could have been settled by the Insurer plus Defense

17   Expenses up to the date the Insured refused to settle such Claim." (Primary Policy § V.

18   (C)(1).)  The hammer clause underscores the fact that, under the Primary Policy, it is

19   Allied World, and only Allied World, that is authorized to defend, investigate, negotiate,

20   and settle a claim.

21        18.    The insurance regulations in California also clarify what it means for an

22   insurer to "investigate" and "negotiate."  *See, e.g.*, 10 Cal. Code Regs. § 2695.7(d)

23   ("Every insurer shall conduct and diligently pursue a thorough, fair and objective

24   investigation and shall not persist in seeking information not reasonably required for or

25   material to the resolution of a claim dispute."); 10 Cal. Code Regs. § 2695.7(g) ("No

26   insurer shall attempt to settle a claim by making a settlement offer that is unreasonably

27   low.").

28

19.     In addition to the Primary Policy, ACM also had two Excess Liability Insurance Policies that were issued by Westchester Surplus Lines Insurance Company (Policy No. G24092240-002, for the policy period of October 1, 2010 to October 1, 2011) (First Excess Policy) and Federal Insurance Company (Policy No. 8210-7780, for the policy period of October 1, 2010 to October 1, 2011) (Second Excess Policy). Coverage under the First Excess policy is only triggered upon exhaustion of the Primary Policy, and coverage under the Second Express Policy is only triggered upon exhaustion of both the Primary Policy and First Excess Policy—*i.e.*, the excess insurers have no obligation to make payment under those policies, or duty to defend or negotiate, until the policy limits of the underlying policies, including the Primary Policy, are exhausted by payment to the insured.

20.     Like the Primary Policy, the Excess Liability Insurance Policies each had $5,000,000 liability limits. In late 2017, ACM's excess insurers tendered their limits in this matter.

**B.  The Underlying Claim**

21.     During the relevant period, ACM acted as a third-party administrator for the insurer QBE, handling various claims on, among other things, automotive policies, as set forth in a Claims Management Agreement ("Claims Agreement") dated January 1, 1999. ACM acted as QBE's agent for purposes of handling and resolving claims against QBE's insureds. The very reason ACM purchased the Primary Policy and Excess Liability Insurance Policies was to insure and protect itself from claims arising out of any negligence or deficient performance by ACM or its employees in connection with providing professional services, *i.e.*, handling and resolving insurance claims on behalf of its insurance company clients, including QBE.

22.     The Claims Agreement granted ACM authority to manage and settle claims for QBE "according to generally accepted procedures normally followed in the insurance claims business and specifically according to the operations and procedures of ACM." In doing so, the Claims Agreement required ACM to, among other things,

1   "diligently manage and pursue the prompt, fair, and just settlement or defense of all

2   Claims in [QBE's] best interest" and "[e]xercise reasonable care at all times in the

3   performance of its duties hereunder."

4        23.   As QBE's third-party administrator and agent, ACM also owed QBE a

5   common-law duty to use reasonable care, diligence, and skill in its work.

6        24.   Under the Claims Agreement, ACM agreed to "indemnify, defend, and

7   hold [QBE] harmless from and against any and all claims, demands, actions,

8   proceedings, losses, damages, costs and expenses (including attorneys' fees), and

9   regulatory fines or charges, made or instituted against, or incurred by [QBE] and arising

10   out of or in connection with any negligence or deficiency of performance hereunder by

11   ACM."

12        25.   In 2011, QBE notified ACM that it may bring a claim against ACM in

13   connection with ACM's handling of a claim brought against QBE's insured Galdino

14   Cortes, to whom QBE had issued an automotive insurance policy with $30,000 limits.

15   Mr. Cortes caused an automobile accident that injured certain individuals in the Cardona

16   family (the "*Cardona* claim"). QBE asserted that the Cardona family had threatened to

17   file a lawsuit against Mr. Cortes, and that ACM had the opportunity to timely resolve

18   the *Cardona* claim for policy limits but did not do so. QBE contended that ACM acted

19   negligently in breach of its duty of care to QBE. QBE, therefore, requested that ACM

20   put its insurers on notice of QBE's claim against ACM. QBE further requested that

21   ACM assure QBE that ACM would defend and indemnify QBE for any litigation arising

22   from ACM's claims handling of this matter and repeatedly raised concerns about QBE's

23   potential extra-contractual liability to Mr. Cortes as a result of ACM's alleged

24   mishandling the *Cardona* claim.

25        26.   Shortly thereafter, ACM notified Allied World and its excess insurers of

26   this claim by QBE. Allied World accepted the claim as covered, subject to a reservation

27   of rights, and assigned a claims adjuster named Brett Arruda to handle the matter.

28

27.     The Cardona family subsequently brought a lawsuit against Mr. Cortes, in an action styled *Cardona v. Cortes* in Lancaster, California, in Los Angeles County.

28.     In or about 2014, as the *Cardona v. Cortes* matter developed, Allied World appointed attorney Alan Jampol of Jampol Zimet, one of Allied World's panel counsel, as counsel for ACM.  At the time of Mr. Jampol's appointment, ACM was not a party in any action concerning the *Cardona* claim.  Allied World unilaterally selected and appointed Mr. Jampol to represent ACM.  Mr. Jampol purported to act as counsel for ACM, though Allied World directed his actions and controlled the "defense."

29.     In March 2014, Mr. Jampol spontaneously proposed that QBE pay Mr. Cortes to assign his extra-contractual rights under his insurance policy to QBE, so that Mr. Cortes could not ultimately assign them to the Cardona family, in the event they later prevailed in their claim against Mr. Cortes (which could leave QBE exposed to the Cardonas' damages beyond the limits of QBE's auto policy issued to Mr. Cortes).  Jampol's suggested assignment scheme would ultimately financially benefit Allied World more than it would benefit ACM.  For ACM, any such claim would already be covered by Allied World under the Primary Policy, which covered any negligence or deficient performance of ACM and its employees in connection with providing professional services, exactly what QBE was concerned with and alleging here.  In contrast, for Allied World, the Jampol scheme would absolve Allied World from paying ACM's claim. If the assignment scheme worked, it would directly limit (or even eliminate) the amount that Allied World would have to pay out under its policy for QBE's covered claim against ACM.

30.     Mr. Jampol represented that he had successfully completed such assignment schemes in the past.  But when subsequently pushed to provide examples when questioned years later—after the assignment scheme had significantly exposed QBE, and ultimately ACM, to increased liability in excess of ACM's policy limits—it became clear that Mr. Jampol had not actually done so, nor was he aware of any others who had arranged such an assignment.

31.     In the summer of 2014, at the time that Mr. Jampol orchestrated this assignment scheme, Mr. Cortes was imprisoned for his role in causing the underlying car accident. Mr. Cortes executed the assignment of his extra-contractual rights to QBE while he was in prison, without his attorney present. It was Mr. Jampol's intention that Mr. Cortes' lawyer not be in attendance when the assignment was presented to Mr. Cortes. After the Cortes family found out about the visit to Mr. Cortes in prison and the assignment scheme, they retained an attorney who demanded that the assignment be rescinded and ultimately brought legal claims against QBE based on the assignment, including a claim for elder abuse.

32.     Rather than reconsider the legality and enforceability of the assignment scheme, Mr. Jampol continued to endorse his assignment scheme as a valid way of having limited the liability exposure for QBE and ACM. Mr. Jampol's real and ultimate goal, as panel counsel for Allied World, was to limit Allied World's exposure as ACM's insurer. Allied World and its claims handler Mr. Arruda allowed this course of action to continue, with Susan Fields of Musick Peeler, Allied World's then coverage counsel, also supporting Jampol's assignment scheme and advocating for it to remain in place.

33.     In January 2015, choosing to support the assignment as valid and binding on QBE and ACM, and acting in its own interest to limit its exposure, Allied World elected not to engage with settlement offers from each member of the Cardona family, totaling approximately $5.25 million—$2,999,999 on behalf of Jose Cardona; $1,999,999 on behalf of Irene Cardona; and $249,999 on behalf of Eduardo Cardona. Allied World made this decision despite QBE's demand that Allied World settle two of the claims that were within its policy limits—*i.e.*, Jose and Irene Cardona's claims. Had Allied World stepped forward to negotiate and settle the claims as Allied World is required to do under the terms of the Primary Policy, QBE's ultimate liability to the Cardonas and Cortes would have been substantially diminished, and ACM would have been in a far better position to resolve any residual liability to QBE.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

34.    Instead, as the *Cardona* claim proceeded towards trial, Mr. Jampol continued to act erratically, making unauthorized statements to QBE with respect to the assignment scheme and regarding ACM's obligations under the Claims Agreement in the event that the Cardonas prevailed and they or Cortes pursued QBE for bad faith liability. Even ACM's excess insurers later agreed and stated that Mr. Jampol's actions "presented a difficult obstacle to the defense of ACM."

35.    In June 2015, the jury reached a verdict in the *Cardona v. Cortes* trial, awarding the Cardona family approximately $22 million in damages.

36.    In or around July 2015, ACM was forced to fire Mr. Jampol, as Mr. Jampol continued to work against ACM's interests and promote Allied World's interests instead. Mr. Jampol continually looked to Allied World for direction and was working as Allied World's attorney, rather than ACM's. In fact, even after ACM fired Mr. Jampol, Mr. Jampol continued to do work for Allied World for months relating to the *Cardona* claim.

37.    ACM knows now that Allied World and Mr. Jampol, as Allied World's panel counsel, had a longstanding financial relationship even before Mr. Jampol was engaged to "defend" ACM. Indeed, in discovery in this matter, Allied World has since admitted to engaging Mr. Jampol or his law firms at least 63 times between 2007 and 2017 alone. It is not surprising that Mr. Jampol elevated Allied World's interests above ACM's and was subject to Allied World's control and direction even when purporting to represent ACM.

38.    Despite the extraordinary damage Mr. Jampol caused to ACM and the fact that ACM fired Mr. Jampol, Allied World continued to assign Mr. Arruda as a claims handler and employed the same coverage counsel for nearly another year, Ms. Fields, never reconsidering its strategy or conduct in handling the claim.

39.    Analyzing Mr. Jampol's assignment scheme in February 2016, Judge Randolph A. Rogers of the Los Angeles Superior Court ruled that the scheme was both

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
11.
FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1    "contrary to public policy" and a breach of fiduciary duty. Judge Rogers further found

2    that the assignment scheme was "sufficient to support a prima facie claim for fraud."

3        40.    Following ACM's firing of Mr. Jampol, Allied World agreed to pay for

4    another defense counsel, Stephen Erigero of Ropers Majeski, to represent and defend

5    ACM.

6        41.    In May 2016, Allied World abruptly terminated Ms. Fields as counsel and

7    around the same time hired Kim Ashmore of Wiley Rein as purported coverage and

8    monitoring counsel. In June 2016, apparently cognizant of Mr. Jampol's astonishingly

9    negative impact on the *Cardona* claim, Allied World then drafted, negotiated, and

10    signed a tolling agreement with Mr. Jampol to preserve the right to pursue malpractice

11    claims against Mr. Jampol (the "Tolling Agreement"). However, Allied World later

12    failed to protect ACM *again*, when it allowed the Tolling Agreement to lapse in June

13    2017, making no effort to extend or renew it. In an August 15, 2017 letter, Allied World

14    admitted that it allowed the Tolling Agreement to expire. By failing to timely extend

15    the Tolling Agreement that it executed with Mr. Jampol prior to its expiration, Allied

16    World again failed in its duty to protect ACM's interest by neglecting to adequately

17    preserve this potential source of recovery and a potential remedy to address the

18    considerable harm that Allied World and Mr. Jampol caused ACM.

19    **C. The *QBE* Claim**

20        42.    In July 2015, after having received a favorable verdict in the *Cardona v.*

21    *Cortes* matter, the Cardona family filed a declaratory judgment action in Los Angeles

22    County against Mr. Cortes and QBE. The Cardonas sought a declaration that Mr.

23    Jampol's assignment scheme was unenforceable.

24        43.    Mr. Cortes and his family then filed a cross-complaint against QBE in the

25    same action, alleging bad faith, fraudulent inducement, negligent and intentional

26    infliction of emotional distress, and elder abuse—all connected to Mr. Jampol's

27    assignment scheme. Mr. Jampol's assignment scheme created additional, substantial

28    claims by Mr. Cortes against QBE which QBE would ultimately look to ACM to cover.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

44.    In the fall of 2015, QBE initiated an arbitration against ACM under the terms of the Claims Agreement (the "*QBE* claim"). ACM tendered that claim to Allied World and its excess insurers, and Allied World and the excess insurers continued to accept the *QBE* claim against ACM as covered and agreed to defend ACM in the arbitration under a reservation of rights. Mystifyingly, Allied World kept Mr. Arruda assigned to ACM's claim, notwithstanding that he had directed a strategy that harmed ACM by significantly increasing the value of QBE's potential claim against ACM by increasing the value of the underlying claim and giving major negotiating power to QBE's (and ultimately ACM's) opponents, the Cardona and Cortes families. Allied World turned a blind eye, failing to reconsider Mr. Arruda's assignment even in light of the significant harm Mr. Arruda's strategy caused to ACM.

45.    In April 2016, the Cardonas and Cortes made a joint settlement offer to QBE demanding $15 million in exchange for releases of both QBE and ACM. This settlement demand was within the limits of the policies issued by Allied World and ACM's excess insurers and was presented to them for consideration, but Allied World made no attempt to negotiate or settle the dispute.

46.    In June 2016, the Cardonas and Cortes made another joint settlement offer to QBE demanding $15 million in exchange for releases of QBE, ACM, and the attorneys, including Mr. Jampol for his assignment scheme. Shortly thereafter, QBE offered to settle all claims against QBE, ACM, and the attorneys involved in the claim arising out of the Cardonas/Cortes matters for $15 million. The offer was, again, within the combined limits of the policies issued by Allied World and ACM's excess insurers and was presented to them for consideration, but Allied World, contrary to its obligations under the policy that it must negotiate and settle a claim on behalf of ACM, made no attempt to settle the dispute and did nothing.

47.    In July 2016, QBE abandoned the Jampol assignment scheme and settled with the Cardonas and Cortes, obtaining releases on behalf of all parties, including Allied World's panel counsel, Mr. Jampol, for $15 million.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

48.     After settling, QBE continued to move forward with its arbitration against ACM, seeking reimbursement for all amounts it paid to settle the Cardona and Cortes matters plus attorneys' fees and other costs in the arbitration against ACM—more than $18 million total.   QBE alleged that ACM's negligent and deficient handling of the *Cardona* claim exposed QBE to extra-contractual liability under Mr. Cortes' auto policy, which was then severely compounded by Mr. Jampol's assignment scheme, and sought to recover these amounts from ACM under several legal theories, including breach of the Claims Agreement and equitable indemnity on account of ACM's negligence and deficient claims handling.

49.     Notably, Allied World contends now that it had no duty to defend or settle QBE's claim against ACM because that claim was excluded under the Primary Policy's "contract" exclusion, which addresses "actual or alleged liability under any express contract or agreement, unless such liability would have attached in the absence of such contract or agreement."   (Primary Policy § IV. (A)(7).)   But Allied World's position ignores the negligence-based theories on which QBE raised and brought its claims and the non-contractual claims QBE pursued against ACM in the arbitration—all claims that "would have attached" even "in the absence of" the Claims Agreement.   Moreover, under California law, when an insured faces an action with claims that are potentially covered and claims that are not potentially covered, the insurer still has a duty to defend, negotiate, and pursue settlement.   Allied World's position is thus untenable.

50.     Mr. Erigero, ACM's replacement defense counsel, wrote and sent numerous defense reports to Allied World and the excess carriers, containing his legal assessment and estimate of potential damages.   These reports recommended and urged settlement, consistently warning Allied World and the excess insurers of the risks of a judgment in excess of ACM's policy limits, with the exposure increased due to Mr. Jampol's assignment scheme.   Mr. Arruda and Allied World's coverage counsel, Ms. Ashmore, did not heed to these warnings.   Ms. Ashmore characterized the *QBE* claim as a straightforward negligence claim that could not possibly be worth very much.   She

Cooley LLP
Attorneys At Law
San Diego

14.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1   also expressed the opinion that Mr. Jampol's actions in orchestrating the assignment

2   scheme did not alter the value of the case.

3        51.    Without giving any valid reason or basis for its conclusions, Allied World

4   continued over the following months to take the position that QBE's claim against ACM

5   simply was not worth very much, without further explanation.  Of course, this failure

6   to heed defense counsel advice or to recognize the extensive harm caused by Mr.

7   Jampol's actions would prove to be wrong-headed as the arbitration unfolded.  When

8   Allied World finally appeared to recognize this, it did too little too late.

9        52.    Despite having a duty to negotiate and settle the claim, Allied World made

10   only a last-minute feeble attempt to settle on ACM's behalf just prior to the

11   commencement of the QBE arbitration, making one opening offer of $2.5 million that

12   it readily admitted to ACM was not viable and too low.  Defense counsel for ACM had

13   repeatedly warned Allied World, for months, of the substantial risks faced by ACM in

14   arbitrating QBE's claims, and ACM and its defense counsel, Mr. Erigero, protested that

15   a much higher amount was needed in order for Allied World to engage in meaningful

16   settlement negotiations with QBE.

17        53.    In response to the $2.5 million offer, QBE indicated that it would consider

18   offers at or above $10 million—within ACM's combined policy limits.  Allied World

19   failed to counter to QBE's invitation to negotiate, and took no further steps to resume

20   settlement discussions or re-engage QBE in a settlement dialog.  This is despite the fact

21   that ACM was later told that Allied World had internally already made the decision to

22   have its entire limits of $5 million available to settle the claim, *though Allied World*

23   *failed to inform ACM of that until after the arbitration decision.*  Allied World's conduct

24   completely foreclosed any opportunity to settle the *QBE* Claim before or during

25   arbitration or during the period of time leading up to the decision.

26        54.    Allied World made the decision to end further settlement discussions with

27   QBE and to proceed with the arbitration.  Just days before the proceeding commenced,

28   in what appeared to be a fit of panic as Allied World realized the risks for ACM in

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1   proceeding, Ms. Ashmore raised concerns about defense counsel's abilities and
2   suggested that the matter be re-staffed just before it was set to begin, even offering to
3   pay for an additional partner from Ropers Majeski to defend the case. This suggestion
4   was simply not feasible and again shows Allied World's failure to property defend its
5   insured in this matter.

6       55.    Continuing to hide from their obligations to defend, negotiate, and settle
7   the claim, neither Mr. Arruda nor Ms. Ashmore attended the arbitration hearing. Allied
8   World instead sent a junior attorney to attend the arbitration hearing, from a completely
9   different law firm, and with no settlement authority. Neither the lawyer nor her law
10  firm had any previous experience with the particularly complex ACM-QBE dispute.
11  This bizarre choice made it impossible for Allied World to understand the progress of
12  the arbitration or initiate and engage intelligently or meaningfully in settlement
13  discussions with QBE during the course of the arbitration.

14      **D.  The Arbitration Award**

15      56.    Once the arbitration concluded, ACM and Mr. Erigero continued to urge
16  Allied World to settle QBE's claim. As Allied World unreasonable dragged its feet and
17  did nothing, on July 24, 2017, the arbitration panel awarded QBE its entire request for
18  damages, for a total of $18,450,855.73. A copy of the award is attached hereto as
19  **Exhibit B**.

20      57.    The panel granted QBE's requested relief under the Claims Agreement's
21  indemnity provision—which requires a showing of "negligence or deficiency of
22  performance" by ACM. The panel recognized ACM as QBE's agent and that ACM
23  breached its duties of care as a third-party administrator to QBE—which was QBE's
24  overarching theory since 2011 through arbitration. Moreover, the panel held that all of
25  QBE's requested damages were caused by ACM's mishandling of the *Cardona* claim—
26  *i.e.*, that ACM's negligence was the cause of QBE's harm. In other words, ACM would
27  have been liable to QBE even in the absence of the Claims Agreement. ACM was not
28  liable to QBE simply because of the Claims Agreement; ACM was liable to QBE

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1  because its negligence caused QBE harm, a free-standing duty memorialized (not

2  created) in the Claims Agreement.

3       58.    Following the panel's issuance of the arbitration award, ACM promptly

4  demanded that Allied World and its excess insurers pay this amount or indemnify ACM

5  for such payment.   Allied World continued to dally over whether to fulfill its policy

6  obligations, while interest accrued daily to ACM's detriment.

7       59.    Weeks *after* the arbitration award, in a letter dated August 15, 2017, Allied

8  World communicated for the first time that it had been prepared to offer its full $5

9  million policy limits towards settlement of the QBE arbitration before the arbitration

10  hearing commenced.   In a blatant act of finger-pointing, Allied World tried to blame the

11  excess carriers for not settling the *QBE* claim, even though the excess carriers' duty to

12  defend or settle a case does not and cannot get triggered until Allied World tenders its

13  policy limits *to its insured, ACM*.  Allied World's written admission *after the arbitration*

14  *decision* that it was willing to tender its full policy limits, but failed to do so, was

15  shocking to ACM.

16       60.    Prior to the arbitration, Allied World had offered only $2.5 million, which

17  its counsel had admitted was low; refused to engage in further settlement discussions

18  despite QBE's willingness to consider additional offers in a reasonable range; raised

19  questions about the abilities of defense counsel; sent a junior attorney unaffiliated with

20  the case to observe; and later admitted that it was willing to pay its full policy limits,

21  but failed to tender its full policy limits *to ACM* as required under the terms of the

22  Primary Policy.  Because Allied World failed to tender its full policy limits *to ACM*, the

23  responsibility of ACM's first excess carrier to then defend, negotiate, and settle could

24  not be triggered.   Allied World's egregious and obstructive behavior caused significant

25  harm to ACM, exposing ACM to an excess judgement above its policy limits and

26  preventing ACM from timely receiving the benefit of ACM's excess policies.

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

**E. Allied World's Post-Arbitration Misconduct**

61.   ACM had an immediate obligation to pay the arbitration award against it. Pursuant to this obligation, on July 27, 2017, ACM sent a letter to Allied World, demanding full and immediate payment of the arbitration award in accordance with its policy obligations.

62.   On August 15, 2017, Allied World sent a letter to ACM, purportedly responding to ACM's demand letter.  However, even though Allied World admitted that it was willing to tender its policy limits before the arbitration commenced, the August 15 letter did not set forth a clear coverage position or a specific response to ACM's coverage demand that it pay the arbitration award.  Instead, Allied World continued to employ dilatory tactics, setting forth ambiguous responses and suggesting that further discussion or mediation should be conducted, despite the immediate need to satisfy the arbitration award rendered against its insured, ACM.

63.   In its August 15, 2017 letter, Allied World also attempted to shift blame to defense counsel's litigation strategy throughout the arbitration, an issue it only first raised shortly before the arbitration hearing started.   Yet, despite Allied World's purported "concerns about the quality of the defense" and the admittedly "disastrous" testimony presented at arbitration, Allied World never increased its settlement offer to QBE above $2.5 million during the course of the arbitration.  In a shocking attempt to find somebody else to pay the claim, Allied World wrote that ACM should consider a claim against Mr. Erigero for malpractice.

64.   Instead of fulfilling its coverage obligations, Allied World hired yet another coverage counsel, Jane Byrne of Quinn Emanuel, and dug its heels in.

65.   In late 2017, after significant pressure from ACM, Allied World finally acknowledged its obligations to provide coverage to ACM in connection with the *Cardona* claim and the *QBE* claim and forwarded its policy limits to partially fund the arbitration award against ACM, subject to a continuing reservation of rights.  However,

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1   approximately $4.9 million of the judgment remains unfunded. Additionally, more than

2   $1.1 million in fees and expenses remains unreimbursed.

3       66.   A significant amount of ACM's unreimbursed fees have been spent on the

4   appeal of QBE's arbitration award through the California courts, which is now complete

5   after the California Supreme Court recently declined review. After the arbitration award

6   issued, Allied World specifically approved ACM's appeal of the award and ACM's

7   selected counsel for handling those proceedings. By doing so, Allied World created a

8   situation in which it knew ACM was incurring additional defense costs relating to the

9   QBE matter, all the while knowing that it would later contend that QBE's claim against

10  ACM was excluded from coverage under the Primary Policy. This forced ACM to

11  continue prosecuting its appeal for fear that Allied World would later assert that ACM

12  failed to mitigate its damages (or a similar defense) even though Allied World knew it

13  would refuse to cover the claim later. This is yet another example of Allied World's

14  unreasonable behavior and bad faith towards its insured.

15      67.   Allied World claims that it does not owe anything more than its policy

16  limits, despite the fact that it was its own actions that (a) significantly increased the

17  value of the underlying claim and the resultant exposure to ACM above ACM's policy

18  limits, and (b) caused ACM to incur additional fees and expenses in connection with

19  the underlying claim, the arbitration, and ACM's ongoing efforts to recover the full

20  benefits of the Primary Policy. ACM demands to be made whole.

21                    **FIRST CAUSE OF ACTION**

22                **(Breach of Contract — Duty to Defend)**

23      68.   ACM incorporates by reference as though fully set forth herein the

24  allegations contained in paragraphs 1 through 67 above.

25      69.   The Primary Policy is a valid and binding contract between ACM and

26  Allied World. At all relevant times, the Primary Policy was in full force and effect.

27      70.   ACM performed all obligations required of it under the Primary Policy,

28  including paying all premiums due on the Primary Policy.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

71.     QBE's claim against ACM was and still is covered under the Primary Policy. Allied World does not dispute that the claim is covered under the Primary Policy's general coverage provisions, but has taken the position that the claim is excluded under the Primary Policy because it relates to "actual or alleged liability under any express contract or agreement." (Primary Policy § IV. (A)(7).) However, the exclusion is curtailed by the critical exception for "liability [that] would have attached in the absence of such contract or agreement." (*Id.*) Indeed, if the exclusion applied here, it would mean that ACM's professional liability policy would only provide coverage as long as ACM did not enter into contracts with its clients, an absurd result. Of course, the very reason ACM purchased the Primary Policy and Excess Liability Insurance Policies was to protect itself from claims arising out of any professional negligence in the professional services ACM provides, *i.e.*, handling and resolving of insurance claims on behalf of its insurance company clients, which included QBE. The Primary Policy is expressly designed to cover ACM for "Professional Services Wrongful Acts," which means, among other things, any actual or alleged "[n]egligent act, error, omission, misstatement, misleading statement, neglect or breach of duty."

72.     As explained above, QBE consistently contended that ACM's negligence in handling the Cardonas claim exposed QBE to extra-contractual liability, and, assuming the facts as the arbitration panel found them, ACM was liable to QBE under a negligence and/or equitable indemnity theory.  The panel awarded QBE damages under the Claims Agreement, which incorporates ACM's duties to QBE should ACM's negligence cause QBE damages.

73.     Under the Primary Policy, Allied World owed and owes a duty to defend ACM.  That duty requires Allied World to, among other things, appoint competent counsel to defend ACM, negotiate and settle claims, and not put the interests of Allied World above its insured's interests.

74.     Allied World does not and cannot dispute that, under the Primary Policy, it accepted coverage and undertook a duty to defend ACM after QBE threatened a claim

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1   in 2011 and QBE subsequently made a claim against ACM in 2015.  Indeed, Allied

2   World appointed counsel for ACM and paid hundreds of thousands of dollars in defense

3   costs over the course of several years purportedly on ACM's behalf.

4         75.   For the reasons stated above, Allied World breached its duty to defend by

5   at least (1) providing incompetent defense counsel for ACM, (2) by directing and

6   controlling Allied World's panel counsel, Mr. Jampol, as he launched an assignment

7   scheme that increased liability and a court later characterized as *prima facie* fraud; and

8   (3) failing to investigate, conduct negotiations and settle the *QBE* claim when it had

9   many opportunities to do so, including an opportunity to tender its limits in response to

10  QBE's invitation to negotiate within ACM's combined limits during the arbitration.

11        76.   As a direct and proximate result of Allied World's breach of its duty to

12  defend ACM under the Primary Policy, ACM has been damaged in an amount

13  consisting of the above stated damages ACM incurred and continues to incur.

## SECOND CAUSE OF ACTION

### (Breach of Contract — Duty to Indemnify)

16        77.   ACM incorporates by reference as though fully set forth herein the

17  allegations contained in paragraphs 1 through 76 above.

18        78.   The Primary Policy is a valid and binding contract between ACM and

19  Allied World and was in full force and effect at all relevant times.

20        79.   ACM performed all of its obligations under the Primary Policy, including

21  paying all premiums due.

22        80.   QBE's claim against ACM was and still is covered under the Primary

23  Policy.  Allied World does not dispute that the claim is covered under the Primary

24  Policy's general coverage provisions, but has taken the position that the claim is

25  excluded under the Primary Policy because it relates to "actual or alleged liability under

26  any express contract or agreement."  (Primary Policy § IV. (A)(7).)  However, the

27  exclusion is curtailed by the critical exception for "liability [that] would have attached

28  in the absence of such contract or agreement."  (*Id.*)  Indeed, if the exclusion applied

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1   here, it would mean that ACM's professional liability policy would only provide

2   coverage as long as ACM did not enter into contracts with its clients, an absurd result.

3   Of course, the very reason ACM purchased the Primary Policy and Excess Liability

4   Insurance Policies was to protect itself from claims arising out of any professional

5   negligence in the professional services ACM provides, *i.e.*, handling and resolving of

6   insurance claims on behalf of its insurance company clients, which included QBE. The

7   Primary Policy is expressly designed to cover ACM for "Professional Services

8   Wrongful Acts," which means, among other things, any actual or alleged "[n]egligent

9   act, error, omission, misstatement, misleading statement, neglect or breach of duty."

10   81.   As explained above, QBE consistently contended that ACM's negligence

11   in handling the Cardonas claim exposed QBE to extra-contractual liability, and,

12   assuming the facts as the arbitration panel found them, ACM was liable to QBE under

13   a negligence and/or equitable indemnity theory.   The panel awarded QBE damages

14   under the Claims Agreement, which incorporates ACM's duties to QBE should ACM's

15   negligence cause QBE damages.

16   82.   Allied World had and continues to have a duty to indemnify ACM for

17   ACM's incurred "Loss," which includes its defense costs and all amounts that ACM is

18   legally obligated to pay as damages, including the full amount of the judgment issued

19   against ACM.

20   83.   Allied World breached its duty to indemnify ACM by failing to settle

21   (despite having repeated reasonable opportunities to do so), by causing ACM to incur

22   additional defense costs (which eroded the amount available under the policies to pay

23   towards the judgment), and by refusing to pay the judgment in full (which caused ACM

24   to continue to accrue interest on the outstanding amount daily).

25   84.   To date, Allied World has failed to withdraw its reservation of rights and

26   continues to refuse to fully indemnify ACM in connection with the excess judgment

27   rendered against ACM which was contributed to by Allied World's panel counsel, Mr.

28   Jampol and Allied World's failure to negotiate and settle the claim as required by the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22.

Primary Policy.   In fact, Allied World is seeking a full reimbursement of amounts already paid to ACM in this litigation.

85.     As a direct and proximate result of Allied World's breach of its duty to indemnify ACM under the Primary Policy, ACM has been damaged in an amount consisting of:   The remaining and unpaid amount of the judgment against ACM, any interest owed on this judgment, and the additional fees and expenses that ACM has been forced to incur in its efforts to compel Allied World to fulfill its duty to indemnify and defend against Allied World's counterclaims for reimbursement of amounts already paid.

### THIRD CAUSE OF ACTION

**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)**

86.     ACM incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 85 above.

87.     In every contract of insurance, including the Primary Policy, there is an implied covenant of good faith and fair dealing that the insurer will (a) act in good faith and deal fairly with its insured; (b) do nothing to interfere with the insured's right to receive benefits under the policy; (c) give at least as much consideration to the interests of the insured as to its own interests; (d) exercise diligence, good faith, and fidelity in safeguarding the insured's interests; (e) deal ethically with the insured; and (f) fairly and adequately inform the insured regarding the nature and scope of its coverage.   Allied World owed all these duties to ACM under the Primary Policy.

88.     Included in Allied World's duty of good faith and fair dealing is the requirement that it settle claims against its insured (a) when an injured party has communicated to the insurer an interest in settlement, or (b) when some other circumstances put the insurer on notice that settlement within the policy limits could be feasibly negotiated.   Allied World repeatedly failed in this duty by ignoring and rejecting settlement demands within the policy limits that were made by the underlying plaintiffs and by QBE. Allied World continued to violate its duty of good faith and fair

CooLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23.

FIRST AMENDED COMPLAINT
CASE No. 18-cv-00925-JLS-MSB

1   dealing each time a demand was made by the underlying plaintiffs and QBE, including

2   when QBE indicated during the arbitration that settlement within policy limits could be

3   feasibly negotiated between Allied World and QBE.  Each of Allied World's refusals

4   to negotiate and settle increased ACM's exposure in this matter, as demonstrated by the

5   damages ultimately awarded against ACM.   Allied World failed to carefully and

6   realistically assess the magnitude of potential damages against ACM, prioritizing its

7   own interests above ACM's interests.

8       89.    In addition, Allied World acted unreasonably and in bad faith by

9   appointing incompetent counsel—purportedly to represent ACM—and then directing

10  and controlling Allied World's own panel counsel as he pursued an assignment scheme

11  designed to ultimately protect only Allied World (which a California judge later

12  described as *prima facie* fraud).  Allied World acknowledged that Mr. Jampol's conduct

13  was so damaging to ACM that it could amount to malpractice when it executed a tolling

14  agreement with Mr. Jampol to preserve Allied World and ACM's claims against him.

15  In another complete failure to protect the interests of its insured, however, Allied World

16  then allowed that tolling agreement to lapse a year later.  Allied World thus breached

17  its duty to protect ACM's interests when it neglected to preserve an alternative potential

18  source of recovery, despite the considerable harm that Mr. Jampol caused ACM.

19      86. Allied World also acted unreasonably and in bad faith by failing to conduct

20  and diligently pursue a fair objective investigation into the value of the claims against

21  ACM (including by assigning an uninformed claims handler and refusing to reassign

22  the claim to a different claims handler); by ignoring ACM's and defense counsel's

23  recommendations regarding the value of the claim and how Mr. Jampol's assignment

24  scheme further increased QBE's claim against ACM; by failing to make meaningful

25  attempts to negotiate and settle the claim at various mediations  and prior to and during

26  the arbitration with QBE (including making QBE an offer that Allied World later

27  admitted was far too low); and by unreasonably refusing to pay or reimburse ACM for

28  the resolution of the *QBE* claim (including the QBE arbitration award).  Accordingly,

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

1    Allied World violated at least 10 Cal. Code Regs. § 2695.7(d) ("Every insurer shall

2    conduct and diligently pursue a thorough, fair and objective investigation and shall not

3    persist in seeking information not reasonably required for or material to the resolution

4    of a claim dispute.") and 10 Cal. Code Regs. § 2695.7(g) ("No insurer shall attempt to

5    settle a claim by making a settlement offer that is unreasonably low.").

6        87. In a breach of the implied covenant of good faith and fair dealing, Allied

7    World committed the acts alleged above for the purpose of consciously withholding

8    from ACM the rights and benefits to which ACM is entitled under the Primary Policy,

9    without considering ACM's interests at least to the same extent as its own interests.

10    The acts of Allied World were inconsistent with ACM's reasonable expectation,

11    contrary to insurance industry customs and practice, contrary to legal requirements, and

12    constitute bad faith.

13        88. As a direct and proximate result of the unreasonable and bad-faith conduct

14    of Allied World, ACM has suffered and will continue to suffer substantial monetary

15    damages and prejudice.  This bad faith renders Allied World liable for the full amount

16    of the judgment issued against ACM in the arbitration, including (a) interest and all

17    additional fees and expenses ACM was forced to incur as a result of Allied World's

18    actions in the *Cardona* Claim and the *QBE* Claim and (b) other economic and

19    consequential damages in an amount to be determined according to proof at trial.

20        89. As a direct and proximate result of Allied World's actions, ACM has been

21    damaged in an amount in excess of this Court's jurisdictional minimum.   These

22    damages include any cost to satisfy the QBE arbitration award, which Allied World is

23    obligated to pay.

24        90. Pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), ACM is entitled

25    to recover all attorneys' fees and expenses it reasonably has incurred, and is incurring,

26    in its efforts to obtain the benefits due under the Primary Policy that Allied World has

27    wrongfully withheld, and is withholding, in bad faith. ACM is also entitled to interest.

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

91. The conduct of Allied World is shocking and has been done with a conscious disregard of ACM's rights. Allied World has acted with oppression, fraud, and/or malice. As detailed above, Allied World engaged in a series of acts designed to deny ACM the benefits due under the Primary Policy by continually refusing to defend, investigate, negotiate and settle the *QBE* claim. Specifically, by acting as alleged above, Allied World, in light of information, facts, and relevant law to the contrary, consciously disregarded ACM's contractual rights to a proper defense and forced ACM to incur substantial financial losses, inflicting substantial financial damage on ACM. Allied World ignored ACM's interests and concerns, with the requisite intent to injure, and it acted fraudulently within the meaning of California Civil Code § 3294. Accordingly, ACM is entitled to an award of exemplary and punitive damages in such amount as is sufficient to punish Allied World for its willful and tortious actions and to deter similar conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, ACM prays that this Court enter a judgment against Allied World and in favor of ACM as follows:

**ON THE FIRST CAUSE OF ACTION:**

1.    For general and special damages according to proof;

2.    For attorneys' fees; and

3.    For prejudgment interest.

**ON THE SECOND CAUSE OF ACTION:**

1.    For general and special damages according to proof;

2.    For attorneys' fees; and

3.    For prejudgment interest.

**ON THE THIRD CAUSE OF ACTION:**

1.    For general and special damages according to proof;

2.    For prejudgment interest;

3.    For exemplary and punitive damages;

Cooley LLP
Attorneys At Law
San Diego

26.

First Amended Complaint
Case No. 18-cv-00925-JLS-MSB

4.    For attorney's fees and costs incurred to prove ACM's entitlement to insurance benefits wrongfully withheld; and

5.    For damages in the full amount of the judgment rendered against ACM in the arbitration, including interest.

**ON ALL CAUSES OF ACTION**:

1.    For costs of suit incurred herein; and

2.    For such other and further relief as may be just.

Dated:    April 29, 2019

COOLEY LLP
WILLIAM V. O'CONNOR (216650)
DANE R. VORIS (281051)
ALEXANDER R. MILLER (294474)


/s/ *William V. O'Connor*
William V. O'Connor (216650)

Attorneys for Plaintiff and Counterclaim-Defendant American Claims Management, Inc.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

27.

FIRST AMENDED COMPLAINT
CASE NO. 18-cv-00925-JLS-MSB

# EXHIBIT A



# Professional Liability Insurance with Employment Practices Liability Coverage

☐ **Darwin National Assurance Company**
☒ **Darwin Select Insurance Company**

**Policy Number:** 0304-9994

THIS IS A CLAIMS-MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE. DEFENSE EXPENSES ARE PAID IN ADDITION TO THE LIMIT OF LIABILITY UNDER INSURING AGREEMENT I(A). HOWEVER, THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS UNDER INSURING AGREEMENT I(B) WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

THIS POLICY ONLY PROVIDES COVERAGE IF THE NAMED INSURED QUALIFIES AS A "CLAIMS-FREE ACCOUNT," AS DEFINED IN SECTION III. DEFINITIONS OF THE POLICY.

---

**Item 1. Name and Mailing Address of Named Insured:**
American Claims Management, Inc. dba American Commercial Management
701 B Street, Suite 2100
San Diego, CA 92101

---

**Item 2. Policy Period:**

(a) Inception Date: October 1, 2010
(b) Expiration Date: October 1, 2011
**At 12:01AM Standard Time at the Mailing Address Shown Above**

---

**Item 3. Limits of Liability:**

(a) $5,000,000 PL Limit of Liability - Insurer's Maximum Limit of Liability for all Loss from each Claim under Insuring Agreement I(A).

(b) $5,000,000 PL Limit of Liability - Insurer's Maximum Limit of Liability for all Loss from all Claims under Insuring Agreement I(A).

(c) $N/A EPL Limit of Liability - Insurer's Maximum Limit of Liability for all Loss and Defense Expenses from each Claim under Insuring Agreement I(B).

(d) $N/A EPL Limit of Liability - Insurer's Maximum Limit of Liability for all Loss and Defense Expenses from all Claims under Insuring Agreement I(B).

(e) $N/A Insurer's maximum Limit of Liability for all punitive, exemplary and multiplied damages, each Claim and in the aggregate for all Claims, under Insuring Agreement I(A).
Subject to the per Claim and aggregate Limits of Liability set forth in Items 3(a) and (b) above.

(f) $N/A Insurer's maximum Limit of Liability for all punitive, exemplary and multiplied damages, each Claim and in the aggregate for all Claims, under Insuring Agreement I(B).
Subject to the per Claim and aggregate Limits of Liability set forth in Items 3.(c) and (d) above.

---

This insurance is issued pursuant to the CA Insurance Code, Sections 1760 through 1780, and is place in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.
DRWN E3005 (8/2007)

**Item 4. Retentions:**

    (a)    $100,000 each and every Claim under Insuring Agreement I(A);

    (b)    $N/A each and every Claim under Insuring Agreement I(B).

**Item 5. Insured's Profession:** Third Party Claims Administrator

**Item 6. Notices Required to be Given to the Insurer Must Be Addressed to:**

Darwin Professional Underwriters, Inc.
9 Farm Springs Road
Farmington, CT 06032

**Item 7. Premium:**

Total Premium:    $94,994

> THE FOLLOWING APPLY IN ADDITION
> TO THE POLICY PREMIUM SHOWN
> STATE TAX: $2,849.82
> STAMPING FEE: $237.49

**Item 8. Retroactive Date (if applicable):**

    (a)    August 8, 2007 for Insuring Agreement I(A);

    (b)    N/A for Insuring Agreement I(B).

**Item 9. Extended Reporting Period:**

    (a)    12 Months for an Additional Premium of 100% of the Premium set forth in Item 7.

    (b)    24 Months for an Additional Premium of 150% of the Premium set forth in Item 7.

**Item 10. Endorsements Attached at Issuance:**
1. s1006 DSI (1/2010) Service Of Suit
2. v1876 (1/2007) Additional Insured(s)
3. v1881 (1/2007) Delete Insuring Agreement B – Employment Practices Liability
4. v1901 (8/2008) Claims Services
5. v1907 (1/2007) Defense within the Limits, Insuring Agreement I(A)
6. v1920 (1/2007) No Coverage for Punitive Damages
7. v1924 (1/2007) Remove "Claims Free" Warranty Language

This insurance is issued pursuant to the CA Insurance Code, Sections 1760 through 1780, and is place in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.
DRWN E3005 (8/2007)

THIS POLICY CONSISTS OF THESE DECLARATIONS, THE POLICY FORM, THE APPLICATION AND ALL ENDORSEMENTS, AND REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE INSURED RELATING TO THIS INSURANCE.

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers.**

_____
SECRETARY

_____
PRESIDENT

_____
AUTHORIZED REPRESENTATIVE

This insurance is issued pursuant to the CA Insurance Code, Sections 1760 through 1780, and is place in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.
DRWN E3005 (8/2007)

## NOTICE

1. **THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: www.insurance.ca.gov.**

5. **FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE, AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER:   1-800-927-4357.**

6. **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

D-2 Form (5/2009)

# CALIFORNIA – SUITS INVOLVING A SURPLUS LINES BROKER - REMEDIES

A.  A surplus lines insurer may be sued upon any cause of action arising in this state under any surplus lines insurance contract made by it, or any evidence of insurance issued or delivered by the surplus lines broker, pursuant to the procedure set forth in Sections 1610 to 1620, inclusive. Any policy or evidence of insurance issued by the surplus lines insurer or the surplus lines broker shall contain a provision stating the substance of this section, and designating the person to whom the Commissioner shall mail process.

B.  Every surplus lines insurer assuming a surplus lines insurance shall be deemed thereby to have subjected itself to this chapter.

C.  The remedies provided by this section shall be in addition to any other methods provided by law for service of process.

IL 00017 04 (11/08)

**ENDORSEMENT NO. 1**

**SERVICE OF SUIT**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

| | |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. dba American Commercial Management |
| Issued by | Darwin Select Insurance Company |

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the Statute, or his successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured(s) or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the below named as the person whom the said officer is authorized to mail process or a true copy thereof.

It is further agreed that service of process in such suit may be made upon Timothy J. Curry, Secretary, or his nominee, at 9 Farm Springs Road, Farmington, CT 06032 and that in any suit instituted against any one of them upon this policy, the Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal.

NOTHING HEREIN SHALL VARY, ALTER, WAIVE, OR EXTEND ANY OF THE TERMS, PROVISIONS, REPRESENTATIONS, CONDITIONS OR AGREEMENTS OF THE POLICY OTHER THAN AS STATED ABOVE.

s1006 DSI (1/2010)

**ENDORSEMENT NO. 2**

**ADDITIONAL INSURED(S)**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

| | |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. dba American Commercial Management |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, it is understood and agreed that the term "**Insured**" as defined in Section III. DEFINITIONS of the Policy, is amended to include the following individuals or entities:

Superior Recovery Services, Inc.
Investigative Solutions, Inc.
Premier Interpreting and Transportation, Inc.; Provided, for this **Insured** only, Section IV.B.10.a shall be deleted in its entirety.
Arrowhead General Insurance Agency Super Holding Corp.
Arrowhead General Insurance Agency, Inc.
Arrowhead Claims Management, Inc. DBA: American Commercial Management
ACM
Pacific Claims Services

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

v1876 (1/2007)

**ENDORSEMENT NO. 3**

**DELETE INSURING AGREEMENT B – EMPLOYMENT PRACTICES LIABILITY**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

| | |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. dba American Commercial Management |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, it is hereby agreed that:

1.  Insuring Agreement (B) of Section I. INSURING AGREEMENTS of the Policy, Employment Practices Liability, is hereby deleted in its entirety, and no coverage shall be provided thereunder; and

2.  The Policy and Declarations Page are deemed amended to delete any further reference to the coverage described in Insuring Agreement (B), provided that any terms and conditions which give meaning to the coverage provided under Insuring Agreement A of this Policy shall remain.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

v1881 (1/2007)

**ENDORSEMENT NO. 4**

**CLAIMS SERVICES**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

      Policy No.    0304-9994
      Issued to    American Claims Management, Inc. dba American Commercial Management
      Issued by   Darwin Select Insurance Company

In consideration of the premium charged, it is hereby agreed that no coverage will be available under this Policy for **Loss** and **Defense Expenses**, from any **Claim** or **Disciplinary Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    lack of good faith or fair dealing in the handling of any claim or obligation arising under an insurance contract or policy or from any benefit plan;

(2)    activities as a public adjuster;

(3)    viatical settlement, life settlement or senior settlement, including, but not limited to, the sale, transfer or purchase of an existing life insurance policy, annuity or other investment product, or any benefit available thereunder, for a discounted value;

(4)    structured settlements;

(5)    safety engineering or inspections;

(6)    marine survey work; or

(7)    evaluation of any medical treatments, determination of the necessity of medical treatment options, or review, consultation or recommendation of medical treatment options or any care setting.

The applicability of Exclusion (1) above may be determined by an admission, final adjudication or a finding in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**. If any **Insured** in fact engaged in the conduct specified this Exclusion, such **Insured** and the **Named Insured** will reimburse the **Insurer** for any **Defense Expenses** advanced to or on behalf of such **Insured**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
                        Authorized Representative

**ENDORSEMENT NO. 5**

**DEFENSE WITHIN THE LIMITS, INSURING AGREEMENT I(A)**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

| | |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. dba American Commercial Management |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, it is hereby agreed that:

1.    The caption at the top of the Policy and Declarations is amended to read as follows:

> **"THIS IS A CLAIMS-MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.  THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**
>
> **THIS POLICY ONLY PROVIDES COVERAGE IF THE NAMED INSURED QUALIFIES AS A "CLAIMS-FREE ACCOUNT," AS DEFINED IN SECTION III. DEFINITIONS OF THE POLICY."**

2.    Insuring Agreement I.(A) is amended to read as follows:

> "(A)    Professional Liability
>
> The **Insurer** will pay on behalf of the **Insured**, **Loss** and **Defense Expenses** in excess of the applicable Retention from any **Claim** first made against the **Insured** and reported to the **Insurer** during the **Policy Period** or any applicable Extended Reporting Period, for a **Professional Services Wrongful Act** committed on or after the applicable **Retroactive Date** and before the end of the **Policy Period**.
>
> As part of, and subject to, the Limits of Liability set forth in ITEMS 3(a) and 3(b) of the Declarations and Condition V(D)(2), the **Insurer** has the right and duty to defend any **Claim** for a **Professional Services Wrongful Act** which is covered in whole or in part under the Policy, even if such **Claim** is groundless, false or fraudulent."

3.    Section V. CONDITIONS, subsection (A)(1) is amended to read as follows:

> "(1)    Professional Liability
>
> (a)    The maximum Limit of Liability of the **Insurer** for all **Loss** and **Defense Expenses** in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from each **Claim** under Insuring Agreement I(A) for which this Policy provides coverage, shall be the amount set forth in ITEM 3(a) of the Declarations.
>
> (b)    The maximum aggregate Limit of Liability of the **Insurer** for all **Loss** and **Defense Expenses** in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from all **Claims** under Insuring Agreement I(A) for

v1907 (1/2007)

which this Policy provides coverage, shall be the amount set forth in ITEM 3(b) of the Declarations."

4.   Section V. CONDITIONS, subsection (A)(3)(a) is amended to read as follows:

"(a)   **Defense Expenses** payable under Insuring Agreement I(A) are part of, and not in addition to the **Insurer's** applicable Limit of Liability, and payment of **Defense Expenses** shall reduce such Limit of Liability."

5.   Item 3. of the Declarations, subsections (a) and (b) are amended to read as follows:

**"Item 3.  Limits of Liability:**

| | | |
|---|---|---|
| (a) | $5,000,000 | Insurer's Maximum Limit of Liability for all Loss and Defense Expenses from each Claim under Insuring Agreement I(A). |
| (b) | $5,000,000 | Insurer's Maximum Limit of Liability for all Loss and Defense Expenses from all Claims under Insuring Agreement I(A)." |

6.   Section V. CONDITIONS, subsection (C)(2) is amended to read as follows:

"(2)   The **Insurer** will have no obligation to pay **Loss** or **Defense Expenses**, or to defend or continue to defend any **Claim**, after the **Insurer's** applicable maximum aggregate Limit of Liability, has been exhausted by the payment of **Loss** or **Defense Expenses**. If the **Insurer's** maximum aggregate Limit of Liability under Insuring Agreement (A) set forth in ITEM 3(b) of the Declarations is exhausted by the payment of **Loss** or **Defense Expenses**, the entire premium will be deemed fully earned."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

v1907 (1/2007)

**ENDORSEMENT NO. 6**

**NO COVERAGE FOR PUNITIVE DAMAGES**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

Policy No.     0304-9994
Issued to       American Claims Management, Inc. dba American Commercial Management
Issued by      Darwin Select Insurance Company

In consideration of the premium charged, it is hereby agreed that:

1.     Items 3(e) and 3(f) shall be deemed deleted from the Policy Declarations Page.

2.     The definition of "Loss" in Section III. DEFINITIONS, subsection (N) of the Policy,
        is amended to read as follows:

"(N)     "**Loss**" means damages, pre-judgment interest, post-judgment interest, judgments,
            settlements, or other amounts that an **Insured** is legally obligated to pay as a result of a
            **Claim** or **Disciplinary Proceeding**, and with respect to any **Claim** under Insuring
            Agreement B, **Specified Multiplied Damages**.

**Loss** shall not include:

(i)     fines, taxes or penalties;
(ii)    **Defense Expenses**;
(iii)   relief or redress in any form other than damages, including but not limited to costs
         associated with compliance with the Americans with Disabilities Act or similar
         provisions of any federal, state, or local statutory or common law;
(iv)   the return of fees or other compensation paid to the **Insured**;
(v)    the cost of correcting, re-performing or completing any **Professional Services**; or
(vi)   salary, wages, or other employment-related benefits which any **Insured** is obligated
         to pay to any **Employee** under a written contract either to commence employment or
         to make any payment in the event of termination of employment;
(vii)  punitive, exemplary or multiplied damages, other than **Specified Multiplied**
         **Damages** in connection with any **Claim** under Insuring Agreement B, provided that
         the most the **Insurer** shall pay for **Specific Multiplied Damages** in connection with a
         **Claim** under Insuring Agreement B shall be $N/A, which amount shall be part of and
         not in addition to the EPL Limits of Liability set forth in ITEMS 3(c) and 3(d) of the
         Declarations."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

v1920 (1/2007)

**ENDORSEMENT NO. 7**

**REMOVE "CLAIMS FREE" WARRANTY LANGUAGE**

This Endorsement, effective at 12:01AM on October 1, 2010, forms parts of

|   |   |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. dba American Commercial Management |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, it is hereby agreed that:

1.  The sentence beginning with "THIS POLICY ONLY PROVIDES COVERAGE IF ..." as set forth in the Caption at the top of the Policy and Declarations is deleted in its entirety.

2.  The definition of a "**Claims-Free Account**" in Section III.DEFINITIONS, subsection (D), is deleted in its entirety and any references thereto in the Policy form.

3.  Section V. CONDITIONS, subsection (L)(2) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

v1924 (1/2007)

**ENDORSEMENT NO. 8**

**DELETE ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on October 1, 2010, forms part of

| | |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged it is hereby agreed that Endorsement No. 4, Claims Services, v1901 (8/2008), is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

v1037 (11/2003)

**ENDORSEMENT NO. 9**

**CLAIMS SERVICES**

This Endorsement, effective at 12:01 a.m. on October 1, 2010, forms part of

|  |  |
|---|---|
| Policy No. | 0304-9994 |
| Issued to | American Claims Management, Inc. |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, it is hereby agreed that no coverage will be available under this Policy for **Loss** and **Defense Expenses**, from any **Claim** or **Disciplinary Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     lack of good faith or fair dealing in the handling of any claim or obligation arising under an insurance contract or policy or from any benefit plan;

(2)     activities as a public adjuster;

(3)     viatical settlement, life settlement or senior settlement, including, but not limited to, the sale, transfer or purchase of an existing life insurance policy, annuity or other investment product, or any benefit available thereunder, for a discounted value;

(4)     safety engineering or inspections;

(5)     marine survey work; or

(6)     evaluation of any medical treatments, determination of the necessity of medical treatment options, or review, consultation or recommendation of medical treatment options or any care setting.

The applicability of Exclusion (1) above may be determined by an admission, final adjudication or a finding in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**. If any **Insured** in fact engaged in the conduct specified this Exclusion, such **Insured** and the **Named Insured** will reimburse the **Insurer** for any **Defense Expenses** advanced to or on behalf of such **Insured**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

ACM Manu B



**THIS IS A CLAIMS-MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE. DEFENSE EXPENSES ARE PAID IN ADDITION TO THE LIMIT OF LIABILITY UNDER INSURING AGREEMENT I(A). HOWEVER, THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS UNDER INSURING AGREEMENT I(B) WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THIS POLICY ONLY PROVIDES COVERAGE IF THE NAMED INSURED QUALIFIES AS A "CLAIMS-FREE ACCOUNT," AS DEFINED IN SECTION III. DEFINITIONS, OF THE POLICY.**

**In consideration of the payment of the premium, in reliance on the Application, and subject to all of the terms, conditions and limitations of, and any endorsements to this Policy, the Insurer and the Insured agree as follows:**

## I.   INSURING AGREEMENT

(A)   Professional Liability

The **Insurer** will pay on behalf of the **Insured**, **Loss** in excess of the applicable Retention from any **Claim** first made against the **Insured** and reported to the **Insurer** during the **Policy Period** or any applicable Extended Reporting Period, for a **Professional Services Wrongful Act** committed on or after the applicable **Retroactive Date** and before the end of the **Policy Period**.

In addition to the Limits of Liability set forth in ITEMS 3(a) and 3(b) of the Declarations, and subject to CONDITION V(D)(2), the **Insurer** has the right and duty to defend any **Claim** for a **Professional Services Wrongful Act** which is covered in whole or in part under the Policy, even if such **Claim** is groundless, false or fraudulent.

(B)   Employment Practices Liability

The **Insurer** will pay on behalf of the **Insured**, **Loss** and **Defense Expenses** in excess of the applicable Retention from any **Claim** first made against the **Insured** and reported to the **Insurer** during the **Policy Period** or any applicable Extended Reporting Period, for an **Employment Practices Wrongful Act** committed on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; provided, however, that the most the **Insurer** shall pay in connection with each **Claim** and in the aggregate for all **Claims** for **Employment Practices Wrongful Acts** shall be $25,000 , unless a different amount is indicated in ITEMS 3(c) and 3(d) of the Declarations.

As part of and subject to the Limits of Liability set forth in ITEMS 3(c) and 3(d) of the Declarations, and subject to CONDITION V(D)(2), the **Insurer** has the right and duty to defend any **Claim** for an **Employment Practices Wrongful Act** which is covered in whole or in part under the Policy, even if such **Claim** is groundless, false or fraudulent.

In connection with the defense of any **Claim** under either Insuring Agreement I(A) or I(B) of this Policy, as long as there are allegations asserted which are within the coverage afforded by this Policy, the **Insurer** will not allocate any portion of **Defense Expenses** to the **Insured** even if there are allegations which are outside of the

coverage afforded by this Policy.

## II.   SUPPLEMENTAL PAYMENTS

(A)   Reimbursement for Lost Earnings and Reasonable Expenses

The **Insurer** shall reimburse the **Insured** up to $350.00 for actual loss of earnings and reasonable and necessary expenses incurred, for each day such **Insured**, at the **Insurer's** express request, attends a trial, hearing or arbitration arising from a **Claim**; provided, however, that the maximum aggregate amount payable under this provision, regardless of the number of **Claims**, the number of **Insureds**, or the number of days attended, shall be $5,000. Any payment made by the **Insurer** under this provision shall be in addition to the applicable Limit of Liability and shall not be subject to any Retention.

(B)   Disciplinary Proceedings Coverage

The **Insurer** shall reimburse the **Insured**, **Loss** and **Defense Expenses** incurred, with respect to any **Disciplinary Proceeding** initiated against the **Insured** and reported to the **Insurer** during the **Policy Period**; provided, however, that the maximum aggregate amount payable under this provision for **Loss** and **Defense Expenses** for all **Disciplinary Proceedings**, regardless of the number of **Insureds**, shall be $5,000. Any payment made by the **Insurer** under this provision shall be in addition to the applicable Limit of Liability and shall not be subject to any Retention.

No coverage shall be available under this Policy for any fines, sanctions or penalties assessed against an **Insured** as a result of any **Disciplinary Proceeding**.

It shall be the obligation of the **Insured**, and not the **Insurer** to defend any **Disciplinary Proceeding**.

Notwithstanding the foregoing, the maximum amount payable by the **Insurer** under this Section II. for Supplementary Payments, for any and all **Claims and Disciplinary Proceedings** based on or arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally, or in any other way, shall be $5,000.

## III.   DEFINITIONS

(A)   "**Affiliate**" means any entity under common ownership, control or management with any **Insured**. An **Affiliate** shall not include a **Subsidiary**.

(B)   "**Application**" means:
   (1)   the application submitted to the **Insurer**; or
   (2)   any application submitted to any competitor of the **Insurer**, which is provided to the **Insurer** for the purposes of procuring coverage hereunder, and which shall be treated as if it were submitted directly to the **Insurer**;

any and all materials and information submitted to the **Insurer** in connection with any such application, and all publicly available material promulgated by the **Insured** about the **Insured** that the **Insurer** obtained prior to the Inception Date of the Policy, all of which are deemed to be on file with the **Insurer** and are deemed to be attached to, and form a part of, this Policy, as if physically attached.

(C)   "**Claim**" means:

   (1)   any written demand for monetary, non-monetary, or injunctive relief;

(2) any written request to toll or waive any statute of limitations;

(3) any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;

(4) any criminal proceeding which is commenced by the return of an indictment or similar document;

(5) any administrative or regulatory proceeding or investigation, including a proceeding brought by or before the Equal Employment Opportunity Commission or any similar state or local agency, commenced by the filing of a notice of charges, formal order of investigation or similar document; or

(6) any arbitration proceeding.

A **Claim** does not include a **Disciplinary Proceeding**.

A **Claim** will be deemed to have been first made when an **Insured** receives notice of the **Claim**.

(D) "**Claims-Free Account**" means the **Named Insured** if, at the time such entity first applied for professional liability coverage with the **Insurer**, the **Named Insured**, its **Subsidiaries** and its **Insureds** were not aware of a **Wrongful Act** which a reasonable person who is an **Insured** would believe could give rise to a **Claim** for a **Professional Services Wrongful Act** and in the preceding five (5) years had not been named as a respondent or defendant in any **Claim** for a **Professional Services Wrongful Act**.

(E) "**Contaminant-Toxin**" means any of the following:

(1) smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including medical or pharmaceutical supplies and materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants;

(2) mold(s), mildew(s), fungi and/or spore(s); or any materials, goods or products containing, harboring or nurturing any such mold(s), mildew(s), fungi and/or spore(s);

(3) lead, silica or asbestos, whether or not airborne as a particle, contained in or formed as part of a product, structure or other real or personal property, ingested or inhaled or transmitted in any fashion, or found in any form whatsoever; or

(4) nuclear reaction, radioactive contamination or any radiation of any kind, including but not limited to nuclear radiation and electromagnetic radiation.

(F) "**Defense Expenses**" means reasonable legal fees and expenses incurred by or on behalf of the **Insured** in the defense or appeal of a **Claim** or **Disciplinary Proceeding**; provided that **Defense Expenses** will not include the **Insured's** overhead expenses or any salaries, wages, fees, or benefits of any natural person **Insureds**. **Defense Expenses** shall include the cost of any bond or appeal bond required in any civil suit; provided that the **Insurer** shall not be obligated to apply for or furnish any such bond.

(G) "**Disciplinary Proceeding**" means any proceeding by a regulatory or disciplinary official, board or agency which regulates or oversees the **Insured's** Profession as set forth in ITEM 5 of the Declarations, to investigate charges of professional misconduct by an **Insured** in the performance of or failure to perform **Professional Services**.

(H) "**Domestic Partner**" shall have the meaning prescribed under applicable state law, or in the absence of such law, means one of two natural persons who form a couple living together in a committed, long standing relationship, provided that such persons:

(1) have a common residence that they have shared for a period of two (2) years or more; and

(2) are not blood relatives and are not married or in a domestic partnership with someone else; and

(3) are mentally competent, at least 18 years of age and registered as domestic partners in a local registry, if one exists.

(I)   **"Employee"** means any W-2 wage-earning full-time or part-time employee of the **Named Insured** or any **Subsidiary**.

(J)   **"Employment Practices Wrongful Act"** means any of the following when alleged against an **Insured** by any past or present **Employee**, or any applicant for employment with the **Named Insured** or any **Subsidiary**, in connection with that person's actual or proposed employment relationship with the **Named Insured** or any **Subsidiary**:

(1)   harassment (including sexual harassment whether "quid pro quo," hostile work environment, or otherwise);

(2)   discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability or any basis prohibited by federal, state, or local laws;

(3)   breach of any manual of employment policies or procedures issued by the **Named Insured** or any **Subsidiary**;

(4)   retaliatory action in response to that **Employee's**:

(a)   disclosure or threat of disclosure of any act by an **Insured** alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder;

(b)   actual or attempted exercise of any right that **Employee** has under law;

(c)   filing of any **Claim** under the Federal False Claims Act or any other federal, state, local, or foreign "whistle-blower" law; or

(5)   misrepresentation, libel, slander, humiliation, defamation, or invasion of privacy, wrongful failure to employ or promote, wrongful deprivation of career opportunity, wrongful demotion or evaluation or wrongful discipline.

(K)   **"Insured"** means:
(1)   the **Named Insured**;
(2)   any **Subsidiary**;
(3)   any past, present, or future director, officer, owner, partner, member, manager, or **Employee** of the **Named Insured** or any **Subsidiary**, only while acting within the scope of their duties for the **Named Insured** or any **Subsidiary**;
(4)   an independent contractor, but only while performing **Professional Services** solely on behalf of the **Named Insured** or any **Subsidiary**; and
(5)   any **Joint Venture** and any employee of any such **Joint Venture**, but only if such **Joint Venture** is specifically scheduled on an Endorsement to this Policy and only with respect to the performance of or failure to perform **Professional Services** by the **Named Insured**.

In the event of the death, incapacity, or bankruptcy of a natural person **Insured**, any **Claim** against the estate, heirs, legal representatives, or assigns of such natural person **Insured** for a **Wrongful Act** of such natural person **Insured** will be deemed to be a **Claim** against such natural person **Insured**.

(L)   **"Insurer"** means the company identified on the Declarations page.

(M)   **"Joint Venture"** means a business endeavor, confirmed in a written agreement between the **Named Insured** and one or more entities or individuals, in which the **Named Insured's** participation is the performance of **Professional Services**.

(N)   **"Loss"** means damages, pre-judgment interest, post-judgment interest, judgments, settlements, punitive, exemplary or multiplied damages where insurable under applicable law, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim** or **Disciplinary Proceeding**; provided that in connection

with any **Claim** under Insuring Agreement I(B), coverage for multiplied damages is limited to **Specified Multiplied Damages**.

**Loss** shall not include:

(1)     fines, taxes or penalties;

(2)     **Defense Expenses**;

(3)     relief or redress in any form other than damages, including but not limited to costs associated with compliance with the Americans with Disabilities Act or similar provisions of any federal, state, or local statutory or common law;

(4)     the return of fees or other compensation paid to the **Insured**;

(5)     the cost of correcting, re-performing or completing any **Professional Services**; or

(6)     salary, wages, or other employment-related benefits which any **Insured** is obligated to pay to any **Employee** under a written contract either to commence employment or to make any payment in the event of termination of employment.

For the purpose of determining the insurability of punitive, exemplary or multiplied damages, including **Specified Multiplied Damages**, under this Policy, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction:

(i)    is the location of the court which awarded or imposed such punitive, exemplary or multiplied damages; or

(ii)   is where the **Named Insured** is incorporated or otherwise organized or has a place of business; or

(iii)  is where the **Insurer** is incorporated or has its principal place of business.

The most the **Insurer** shall pay under this Policy for punitive, exemplary or multiplied damages in excess of the applicable Retention shall be the amounts shown in ITEMS 3(e) or 3(f) of the Declarations, which amounts shall be part of, and not in addition to, the applicable per **Claim** and aggregate Limits of Liability for each Insuring Agreement set forth in ITEM 3 of the Declarations.

(O)     "**Named Insured**" means the entity named in ITEM 1 of the Declarations.

(P)     "**Personal Injury**" means one or more of the following offenses:

(1)     false arrest, detention or imprisonment;

(2)     malicious prosecution;

(3)     defamation, including libel and slander, and disparagement;

(4)     a publication or utterance in violation of an individual's right or privacy;

(5)     invasion of the right to private occupancy, including wrongful entry or eviction.

(Q)     "**Policy Period**" means the period from the Inception Date to the Expiration Date in ITEM 2 of the Declarations, or to any earlier cancellation date.

(R)     "**Professional Services**" means services performed by an **Insured** for others:

(1)     in the usual and customary conduct of the Profession set forth in ITEM 5 of the Declarations for a fee or other business consideration inuring to the benefit of the **Named Insured** or any **Subsidiary**; and

(2)     in the capacity of a Notary Public where such notary services are incidental to the performance of such Profession, whether or not such notary services are performed for a fee.

(S)     "**Professional Services Wrongful Act**" means any actual or alleged:

    (1)    Negligent act, error, omission, misstatement, misleading statement, neglect or breach of duty; or

    (2)    **Personal Injury;**

by an **Insured**, in the performance of or failure to perform **Professional Services**.

(T)    **"Related Claims"** means all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally, or in any other way.

(U)    **"Retroactive Date"** means the applicable date specified in ITEM 8 of the Declarations.

(V)    **"Specified Multiplied Damages"** means that portion of a multiplied damages award under the Age Discrimination in Employment Act or the Equal Pay Act that exceeds the damage award so multiplied.

(W)    **"Subsidiary"** means any entity, other than a **Joint Venture** or an **Affiliate**, during any time which the **Named Insured** and/or one or more of its **Subsidiaries**:

    (1)    owns more than fifty percent (50%) of its outstanding voting shares, partnership interest or member units;

    (2)    controls, directly or indirectly, the right to elect or appoint more than fifty percent (50%) of such entity's directors or trustees; or

    (3)    has majority control over the management and operations of the entity through a written agreement;

provided such entity was created or acquired by the **Named Insured** or one or more of its **Subsidiaries**:

    (a)    on or before the Inception Date in ITEM 2(a) of the Declarations;

    (b)    during the **Policy Period**, and the amount of such entity's latest total annual revenues are less than or equal to twenty-five percent (25%) of the latest total annual revenues of the **Insured** entities reported in the most recent **Application**; or

    (c)    during the **Policy Period**, subject to CONDITION (I).

(X)    **"Wrongful Act"** means any **Professional Services Wrongful Act** or **Employment Practices Wrongful Act**.

## IV.    EXCLUSIONS

(A)    No coverage will be available under this Policy for **Loss** or **Defense Expenses**, from any **Claim** or **Disciplinary Proceeding**:

    (1)    against any **Insured** brought about or contributed to by any dishonest or fraudulent act or omission or any willful violation of any statute, rule, or law by any **Insured**; or

    (2)    against any **Insured** brought about or contributed to by the gaining by any **Insured** of any profit, remuneration or advantage to which such **Insured** is not legally entitled;

The applicability of EXCLUSIONS A(1) and A(2) may be determined by an admission, final adjudication or a finding in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**. If any **Insured** in fact engaged in the conduct specified in EXCLUSIONS (A)(1) or (A)(2), such **Insured** and the **Named Insured** will reimburse the **Insurer** for any **Defense Expenses** advanced to or on behalf of such **Insured**. No **Wrongful Act** of any natural person **Insured** will be imputed to any other

natural person **Insured** to determine the application of EXCLUSIONS A(1) or (A)(2);

   (3)    for any actual or alleged violation of or any benefits due under:

        (a)    the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, any workers' compensation, unemployment insurance, social security, or disability benefits law, any amendments to, or rules or regulations promulgated under such statutes or any other similar provisions of any federal, state, or local statutory or common law, including but not limited to any actual or alleged improper payroll practices, wage and hour policies, or payment of overtime or vacation pay;

        (b)    any federal, state or local law or regulation relating to unsolicited telemarketing, solicitations, emails, faxes or any other communications or any type or nature, including but not limited to do-not-call laws or regulations, the Telephone Consumer Protection Act, any federal or state anti-spam statutes, or any other federal or state law relating to a person's or entity's right of seclusion;

   (4)    by or on behalf of, or in the name or right of, any **Insured**, in any capacity, except that this EXCLUSION (A)(4) will not apply to any **Claim**:

        (a) in the form of a cross-claim, third party claim, or other **Claim** for contribution or indemnity by an **Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy; or

        (b) by an **Employee** for an **Employment Practices Wrongful Act**, subject to the EPL Limits of Liability set forth in ITEMS 3(c) and 3(d) of the Declarations,;

   (5)    against any **Subsidiary**, assets, or other entity acquired by the **Named Insured**, whether by merger, consolidation or otherwise, or against any natural person **Insured** of such **Subsidiary**, assets, or other entity, in his or her capacity as such, for any **Wrongful Act** committed during any time in which such entity is not a **Subsidiary** or at any time before the **Named Insured's** acquisition of such asset or entity;

   (6)    brought by or against any **Affiliate**, **Joint Venture**, or any entity or individual that is part of a **Joint Venture**, other than the **Named Insured** itself; provided however, that this EXCLUSION (A)(6) shall not apply to any **Claim** against a **Joint Venture** that is specifically scheduled by Endorsement;

   (7)    for any actual or alleged liability under any express contract or agreement, unless such liability would have attached in the absence of such contract or agreement. For the purposes of this EXCLUSION (A)(7), an "express contract or agreement" is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making; or

   (8)    under Insuring Agreement I(A) based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any **Employment Practices Wrongful Act**.

(B)    No coverage will be available under this Policy for **Loss and Defense Expenses**, from any **Claim** or **Disciplinary Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   (1)    any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, seepage, migration, release, growth, infestation, spread, escape, treatment, removal or disposal of, any **Contaminant-Toxin**, or any regulation, order, direction or

request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Contaminant-Toxin**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request;

(2)   any fact, circumstance, situation, transaction, event, or **Wrongful Act**:

     (a)   underlying or alleged in any prior and/or pending litigation, administrative or regulatory proceeding or arbitration proceeding of which any **Insured** had received written notice before the Inception Date in ITEM 2(a) of the Declarations;

     (b)   which, before the Inception Date in ITEM 2(a) of the Declarations, was the subject of any notice given by or on behalf of any **Insured** under any other policy of insurance;

     (c)   which, on or before the Inception Date in ITEM 2(a) of the Declarations, a reasonable person who is an **Insured** would believe could give rise to a **Claim** or **Disciplinary Proceeding** for which coverage may be provided under this Policy;

If, however, this Policy is a renewal of one or more policy or policies previously issued by the **Insurer** to the **Named Insured**, and the coverage provided by the **Insurer** to the **Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (B)(2) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the **Insurer** began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(3)   any actual or alleged violation of: the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Advisors Act of 1940 or any state "blue sky" law; the Racketeering Influenced and Corrupt Organizations Act of 1970; the Employee Retirement Income Security Act of 1974; any statute protecting any patent, copyright, trademark, trade name, service mark, trade dress, trade secret, confidential information or similar interest; the Federal Trade Commission Act, the Sherman Anti-Trust Act or the Clayton Act; or Title VIII of the Civil Rights Act of 1968, the Fair Housing Amendment Act of 1988 or the Fair Credit Reporting Act, 15 USC Section 1681 et seq.; any amendments to or rules or regulations promulgated under such statutes; or any other similar provisions of any international, federal, state, or local statutory or common law;

(4)   any actual or alleged malfunction of any good or product manufactured, sold or supplied by any **Insured** or supplied by others under license to the **Insured**; the failure of any such good or product to perform in any manner as a result of any defect, deficiency, inadequacy, or dangerous condition in such good or product; the improper or negligent design or manufacture of any such good or product; or the cost of any recall or removal from the marketplace of, or any repair, replacement, upgrading or supplementing of, any such good or product;

(5)   any of the following services or activities: insurance advice or agent or brokerage services; failing to procure or maintain adequate insurance or bonds; financial or investment advice or services, including as to any security, instrument or other investment; advice or services relating to any corporate merger or acquisition, securities offering, restructuring, divestiture, leveraged buy out, tender offer, proxy contest or recapitalization; selecting any investment manager, investment advisor or custodial firm; legal or actuarial services; auditing, certification, review, compilation, or attestation of financial statements, or valuation of a firm or business; architectural, engineering or design services; real estate agent or brokerage services; appraising or inspecting; or dentistry, nursing, midwifery or any other medical services;

(6)   any actual or alleged:

     (a)   loss, disappearance, pilferage or shortage of, or commingling or improper use of, or failure to properly segregate or safeguard, any client or customer funds, monies or

securities, including any loss resulting from computer theft, computer virus or any electronic transfer or from the insolvency, receivership, bankruptcy or liquidation of any business or organization in which the **Insured** has placed or invested such funds;

(b) warranty, guarantee or promise as to (i) the price of any goods or services, costs or cost estimates, contract price or budget, (ii) the future value of any security, financial instrument, real property or other investment, (iii) the rate of return or interest, (iv) potential sales, earnings, profitability or economic value, or (v) the availability of funds;

(c) formation, promotion, sale, pooling, syndication, securitization, operation, administration or servicing of (i) any limited or general partnership or interest therein or (ii) any financial assets, including but not limited to leases, loans, credit cards, real estate mortgages or any form of collateralized debt obligations; or

(d) purchase, sale, origination, participation, grant, commitment, extension, restructuring, termination, transfer, repossession or foreclosure of any loan, financing, lease or extension of credit; or any transaction involving any loan, financing or extension of credit funded, in whole or in part, by any **Insured**, or in which any **Insured** has a direct or indirect beneficial ownership or financial interest;

(7) the rendering of **Professional Services** by any **Insured** who:

(a) at the time such **Professional Services** were rendered, was not properly qualified, certified, bonded or licensed to render such **Professional Services**, if such qualification, certification, bonding or license is legally required to provide such **Professional Services**; or

(b) misrepresented such **Insured's** qualifications, certifications, licensing, experience, knowledge, education, ability or background;

(8) misuse, or unauthorized use or disclosure, of confidential, proprietary or personally identifiable information, including medical or financial information, or the actual or alleged failure to inform customers of any security breach that has impacted or may impact their personal information;

(9) sexual abuse or molestation of any person, or sexual harassment of any customer, client or business invitee of an **Insured**;

(10) any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; provided however, subject to EXCLUSION (B)(9), this EXCLUSION (B)(10) shall not apply to:

(a) a **Claim** for such injury or damage if such injury or damage resulted solely and directly from the actual performance of **Professional Services** and does not involve in any way:

(i) any such injury to any **Employee**;

(ii) the condition of, or property damage to: property owned or rented by, loaned to, or occupied by, any **Insured**; premises sold, given away, or abandoned by the **Insured**, or; property in the care, custody and control of any **Insured**; or

(iii) the ownership, maintenance, operation, use, loading or unloading, or entrustment to others, of any motor vehicle, automobile, aircraft, watercraft or mobile vehicle of any kind; or

(b) mental anguish or emotional distress alleged in a **Claim** for **Employment Practices Wrongful Acts**; or

(11) the notarized certification or acknowledgement of a signature without the physical appearance at the time of such notarization before the notary public of the person who is, or claims to be, the person signing.

## V.    CONDITIONS

(A) **Limit of Liability:**

Regardless of the number of **Claims** brought under this Policy, the number of persons or entities included within the definition of **Insured**, or the number of claimants, the **Insurer's** liability is limited as follows:

(1) Professional Liability

    (a) The maximum Limit of Liability of the **Insurer** for all **Loss**, in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from each **Claim** under Insuring Agreement I(A) for which this Policy provides coverage, shall be the amount set forth in ITEM 3(a) of the Declarations.

    (b) The maximum aggregate Limit of Liability of the **Insurer** for all **Loss**, in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from all **Claims** under Insuring Agreement I(A) for which this Policy provides coverage, shall be the amount set forth in ITEM 3(b) of the Declarations.

(2) Employment Practices Liability

    (a) The maximum Limit of Liability of the **Insurer** for all **Loss** and **Defense Expenses**, in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from each **Claim** under Insuring Agreement I(B) for which this Policy provides coverage, shall be the amount set forth in ITEM 3(c) of the Declarations.

    (b) The maximum aggregate Limit of Liability of the **Insurer** for all **Loss** and **Defense Expenses**, in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from all **Claims** under Insuring Agreement I(B) for which this Policy provides coverage, shall be the amount set forth in ITEM 3(d) of the Declarations.

(3) Defense Expenses

    (a) **Defense Expenses** payable under Insuring Agreement I(A) are in addition to the **Insurer's** applicable Limit of Liability, and payment of such **Defense Expenses** shall not reduce such Limit of Liability.

    (b) **Defense Expenses** payable under Insuring Agreement I(B) are part of, and not in addition to, the **Insurer's** applicable Limit of Liability, and payment of **Defense Expenses** by the **Insurer** will reduce such Limit of Liability.

(B) **Application of Retention; Presumption of Indemnification:**

(1) The obligation of the **Insurer** to pay **Loss** or **Defense Expenses** will only be in excess of the applicable Retention set forth in ITEM 4 of the Declarations. The **Insurer** will have no obligation whatsoever, either to the **Insured** or to any other person or entity, to pay all or any portion of any Retention amount on behalf of any **Insured**, although the **Insurer** will, at its sole discretion, have the right and option to do so, in which event the **Insured** agrees to repay the **Insurer** promptly upon demand any amounts so paid.

(2) If different Retentions are applicable to different parts of any **Claim**, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions on any one individual **Claim** will not exceed the largest applicable Retention as set forth in ITEM 4 of the Declarations.

(C)     **Defense and Settlement of Claims:**

(1)     No **Insured** may incur any **Defense Expenses** or admit liability for, or settle, or offer to settle, any **Claim** without the **Insurer's** written consent. The **Insurer** will have the right to make investigations and conduct negotiations and, with the consent of the **Insured** which shall not be unreasonably withheld, enter into such settlement of any **Claim** as the **Insurer** deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendation, then, subject to the applicable Limit of Liability, the **Insurer's** liability for such **Claim** will not exceed the amount for which such **Claim** could have been settled by the **Insurer** plus **Defense Expenses** up to the date the **Insured** refused to settle such **Claim**.

(2)     The **Insurer** will have no obligation to pay **Loss** or **Defense Expenses**, or to defend or continue to defend any **Claim**, after the **Insurer's** applicable maximum aggregate Limit of Liability, has been exhausted by the payment of **Loss**. If the **Insurer's** maximum aggregate Limit of Liability under Insuring Agreement I(A) set forth in ITEM 3(b) of the Declarations is exhausted by the payment of **Loss**, the entire premium will be deemed fully earned.

(D)     **Other Insurance; Other Indemnification:**

(1)     All **Loss** and **Defense Expenses** payable under this Policy will be specifically excess of and will not contribute with other valid insurance (whether collectible or not), including but not limited to any other insurance under which there is a duty to defend, unless such other insurance is specifically stated to be in excess of this Policy. This Policy will not be subject to the terms of any other insurance.

(2)     Notwithstanding CONDITION (D)(1) above, with respect to any **Claim** under this Policy for which coverage is available under any other insurance policy, including any commercial general liability, automobile or workers' compensation insurance policy, which applies to claims for bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or property damage, the **Insurer** will have no duty to defend such **Claim**, or to pay **Defense Expenses** incurred by or on behalf of any **Insured** in connection with such **Claim**, or to contribute to any defense provided to any **Insured** under such other insurance policy(ies), or to reimburse any other insurer, in whole or in part, for **Defense Expenses** incurred in connection with such **Claim**.

(E)     **Cooperation; Subrogation:**

In the event of a **Claim**, the **Insured** will provide the **Insurer** with all information, assistance, and cooperation that the **Insurer** reasonably requests, and will do nothing that may prejudice the **Insurer's** position or potential or actual rights of recovery. At the **Insurer's** request, the **Insured** will assist in any actions, suits, or proceedings, including but not limited to attending hearings, trials and depositions, securing and giving evidence, and obtaining the attendance of witnesses, and will also assist in making settlements. In the event of payment, the **Insurer** will be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the **Insurer** effectively to bring suit in their name. The obligations of the **Insured** under this CONDITION (E) will survive the expiration or cancellation of the Policy.

(F)     **Spouse and Domestic Partner Extension:**

The coverage afforded under this Policy will, subject to all of its terms, conditions, limitations and

exclusions, be extended to apply to **Loss** and **Defense Expenses** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse or **Domestic Partner** of an natural person **Insured**, but only if: (a) the **Claim** against such spouse or **Domestic Partner** results from a **Wrongful Act** actually or allegedly committed by the natural person **Insured**, to whom the spouse is married or with whom the **Domestic Partner** is residing; and (b) such natural person **Insured** and his or her spouse or **Domestic Partner** are represented by the same counsel in connection with such **Claim**.

(G)     **Extended Reporting Period:**

    (1)     If either the **Insurer** or the **Named Insured** cancels, refuses or declines to renew this Policy for any reason other than non-payment of premium, and, within thirty (30) days of the end of the **Policy Period**, the **Named Insured** elects to purchase the Extended Reporting Period by paying the additional premium set forth in ITEM 9 of the Declarations, then the coverage otherwise afforded by this Policy will be extended to apply to **Loss** from **Claims** first made during the Extended Reporting Period, but only if such **Claims** are for **Wrongful Acts** committed before the end of the **Policy Period** or the date of any conversion of coverage under CONDITION (J), whichever is earlier.

    (2)     The Extended Reporting Period does not increase or reinstate any Limit of Liability and may only be purchased if all premiums and retentions due under the Policy have been paid. Once purchased, the Extended Reporting Period may not be canceled and the premium shall be deemed fully earned.

(H)     **Notice; Timing, and Interrelationship of Claims:**

    (1)     As a condition precedent to any right to payment in respect of any **Claim**, the **Insured** must give the **Insurer** written notice of such **Claim**, with full details, as soon as practicable after it is first made and:
        (a) with respect to a **Claim** made during the **Policy Period**, in no event later than sixty (60) days after the expiration date of the **Policy Period**; or
        (b) with respect to a **Claim** made during the Extended Reporting Period, if purchased pursuant to CONDITION (G), in no event later than ten (10) days after the expiration date of the Extended Reporting Period.

    (2)     If, during the **Policy Period**, the **Insured** first becomes aware of a **Wrongful Act** which may subsequently give rise to a **Claim** and, as soon as practicable thereafter but before the expiration or cancellation of this Policy:

        (a) gives the **Insurer** written notice of such **Wrongful Act**, including a description of the **Wrongful Act** in question, the identities of the potential claimants, the consequences which have resulted or may result from such **Wrongful Act**, the damages which may result from such **Wrongful Act** and the circumstances by which the **Insured** first became aware of such **Wrongful Act**; and

        (b) requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

    then the **Insurer** will treat any such subsequently resulting **Claim** as if it had been first made during the **Policy Period**.

    (3)     All notices under CONDITIONS (H)(1) and (2) must be sent in writing or electronically, to the address set forth in ITEM 6 of the Declarations.

(4)    All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with CONDITION (H)(2), whichever is earlier.

(I)    **Adjustments:**

If, during the **Policy Period**, any **Insured**:

(1)    acquires or creates a **Subsidiary**, or acquires any entity by merger (each a "New Entity") and, at the time of the acquisition or creation, the amount of the New Entity's latest total annual revenues exceed twenty-five percent (25%) of the latest total annual revenues of the **Insured** entities reported in the most recent **Application**; or

(2)    acquires any assets or assumes any liabilities, and, at the time of the acquisition or assumption, the assets or liabilities so assumed exceed twenty-five percent (25%) of the total annual assets or liabilities of the **Insured** entities reported in the most recent **Application**;

(each a "Transaction"), then during a period of sixty (60) days after the effective date of the Transaction or until the end of the **Policy Period**, whichever is earlier:

(i)    the New Entity will be included within the definition of **Insured**; or

(ii)    any **Claim** first made during such period not otherwise excluded relating to such acquired assets or assumed liabilities will be covered under this Policy,

but only with respect to **Wrongful Acts** committed or allegedly committed after the effective date of the Transaction.

Upon the expiration of such sixty (60)-day period, there shall be no coverage under this Policy for any **Wrongful Act** committed or allegedly committed thereafter by the New Entity or its natural person **Insureds**, or for any **Claim** first made thereafter relating to the acquired assets or assumed liabilities, unless the **Named Insured** has provided the **Insurer** with written notice of the Transaction, containing full details thereof, and the **Named Insured** and the **Insurer** have agreed to add coverage for the New Entity and its natural person **Insureds**, or for the acquired assets or assumed liabilities, upon such terms, conditions, and limitations of coverage and such additional premium as the **Insurer**, in its sole discretion, may require.

(J)    **Conversion of Coverage Under Certain Circumstances:**

If, during the **Policy Period**, any of the following events occurs:

(1)    the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity;

(2)    the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the **Named Insured**, provided that this CONDITION (J) shall not apply where the appointment of any such official is a result of the **Insured** declaring bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code;

(3)    the obtaining by any person, entity, or affiliated group of persons or entities of the right to elect, appoint, or designate at least fifty percent (50%) of the directors, trustees, management committee or management board members, of the **Named Insured**;

(4)    any person or entity acquires majority control over the management and operation of the **Named Insured** through a written agreement; or

(5)    with respect to the sale or offering of securities through an initial public offering by the **Named Insured**, either:

    (a) the U.S. Securities and Exchange Commission provides the **Named Insured** with notice that the Registration Statement filed by the **Named Insured** is effective; or

    (b) any foreign exchange commission through which the securities are being sold or offered, declares such sale or offering effective;

then coverage under this Policy will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Wrongful Acts** committed after such event. After any such event, this Policy may not be canceled, regardless of CONDITION (K)(2), and the entire premium for the Policy will be deemed fully earned.

(K)    **Cancellation; No Obligation to Renew:**

    (1)    The **Insurer** may not cancel this Policy except for failure to pay a premium when due. The **Insurer** will deliver or mail by first class, registered or certified mail to the **Named Insured** at its last known address, written notice of cancellation at least ten (10) days before the effective date of cancellation. A copy of such notice shall be sent to the agent of record.

    (2)    The **Named Insured** may cancel this Policy by mailing to the **Insurer** written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, return premium will be computed as 0.90 times the pro rata unearned premium shown in ITEM 7 of the Declarations and rounded to the nearest whole dollar. Premium adjustment may be made either at the time cancellation by the **Named Insured** is effective or as soon as practicable thereafter.

    (3)    The **Insurer** will not be required to renew this Policy upon its expiration. If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail by first class, registered, or certified mail to the **Named Insured** at its last known address written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Declarations. Such notice shall state the specific reason(s) for non-renewal.  A copy of such notice shall be sent to the agent of record.

(L)    **Representations:**

    (1)    The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete, and agrees that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy.

    (2)    The **Insureds** represent and warrant that the **Named Insured** qualifies as a **Claims-Free Account.**

(M)    **Severability:**

    (1)    In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the **Application**, the knowledge of one natural person **Insured** will not be imputed to any other natural person **Insured**, provided, however, that this Policy will be void:

        (a)    with respect to any natural person **Insured** who knew of such untruth, misrepresentation or omission; and

        (b)    with respect to the **Named Insured** or any **Subsidiary**, if, and only if, the Owner, Chief Executive or Chief Financial Officer, President or Manager of the **Named Insured** or such **Subsidiary**, or any natural person holding a functionally equivalent position within the

**Named Insured** or such **Subsidiary**, knew of such untruth, misrepresentation or omission.

 (2) In the event of any misrepresentation in connection with CONDITION (L)(2), this Policy will be void in its entirety.

(N) **No Action against the Insurer:**

 (1) No action may be taken against the **Insurer** unless, as conditions precedent thereto, there has been full compliance with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant, and the **Insurer**.

 (2) No person or entity will have any right under this Policy to join the **Insurer** as a party to any **Claim** to determine the liability of any **Insured**; nor may the **Insurer** be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

(O) **Insolvency of Insured:**

The **Insurer** will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured**.

(P) **Territory:**

This Policy applies to **Wrongful Acts** committed by any **Insured**, or to any **Claim** brought against the **Insured**, anywhere in the world.

(Q) **Authorization and Notices:**

The **Insureds** agree that the **Named Insured** will act on their behalf with respect to receiving any notices and return premiums from the **Insurer**.

(R) **Changes:**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Insurer** will not effect a waiver or change in any part of this Policy or estop the **Insurer** from asserting any right under the terms, conditions, and limitations of this Policy. The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

(S) **Assignment:**

No assignment of interest under this Policy will bind the **Insurer** without its consent.

(T) **Entire Agreement:**

The **Insured** agrees that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** or any of its agents relating to this insurance.

(U) **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

In witness whereof, the **Insurer** has caused this Policy to be executed by its authorized officers, but this Policy will not be

valid unless countersigned on the Declarations page by a duly authorized representative of the **Insurer**.

# EXHIBIT B

### JAMS ARBITRATION NO. A215469-24


QBE INSURANCE CORPORATION, Claimant

v.

AMERICAN CLAIMS MANAGEMENT INC., Respondent



### FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Paragraph V of the Claims Management Agreement entered into between QBE and ACM on January 1, 1999, and having been duly sworn and having duly heard and considered the allegations, arguments and proofs of the parties, hereby render this Final Arbitration Award.

This matter was initially filed with, and administered by Judicate West. The Judicate West arbitrator that QBE initially chose had to be replaced by a JAMS arbitrator due to the temporary incapacity of the former arbitrator. At that time, the administration of this proceeding was taken over by JAMS.

Although each party selected one arbitrator, it was stipulated that all three arbitrators would serve as neutrals, and that there would be no *ex parte* communication between any of the arbitrators and either of the parties or their counsel.

Claimant QBE was represented by Peter H. Klee and Marc J. Feldman of Sheppard Mullin Richter & Hampton LLP, San Diego, California. Respondent ACM was represented by Stephen J. Erigero and Alan J. Hart of Ropers Majeski Kohn Bentley, Los Angeles, California. Also present at the hearings were Mark King and Robert T. Bowling, Brown and Brown, Inc. for Brown & Brown Insurance, Heidi A. Lawson, Mintz Levin Cohn Ferris Glovsky and Popeo PC for ACM, and carrier representatives Caitlin Macker, Collings Collins Muir & Stewart LLP, Andrew J. Waxler, Kaufman Dolowich & Voluck, LLP and Isis Miranda, London Fisher, LLP. David M. Majchrzak of the Klinedinst firm's San Diego office represented witness Alan Jampol during his testimony.

The hearing was conducted in San Diego, California on April 17 - 20, 2017. The parties thereafter submitted post-hearing briefs. Oral argument took place on June 9, 2017. At the conclusion of the arguments, the Panel advised the parties that in light of the vacation and hearing schedules of the Panel, completion of the Final Award might take 45 days, and the parties consented.


### I.   FACTS.

QBE and ACM entered into a Claims Management Agreement ("CMA Agreement" or "the Agreement") on January 1, 1999.  QBE is suing ACM to recover a $15 million settlement, and

**QBE v. ACM Final Award**
July 24, 2017
Page 2 of 23

more than $ 1 million in legal fees, that QBE paid out on account of its policyholder Galindo Cortes.

The parties stipulated to the following facts in advance of the hearing:

1.  ACM is a third party administer that handles claims for QBE under the terms of a Claims Management Agreement. Ex.1.
2.  On February 6, 2011, Galdino Cortes was in a car accident with Jose, Irene, and Eduardo Cardona.
3.  Cortes was insured under a QBE auto policy with liability limits of $30,000 per accident. Ex.2.
4.  On February 23, 2011, the Cardonas mailed a policy limits demand to ACM. Ex.3.
5.  The Cardonas' policy limits demand included a 15-day time limit, which expired on March 10, 2011.
6.  On February 25, 2011, the demand, which was sent by certified mail, was delivered to ACM's P.O. Box in Carlsbad.
7.  On March 29, 2011, ACM offered the policy limits to the Cardonas' attorneys.
8.  The Cardonas' attorneys did not accept the policy limits offer and asserted that the cap was off the QBE policy.
9.  In November 2012, the Cardonas sued Cortes. With QBE's approval, ACM hired attorneys to defend Cortes.
10. In July 2014, Attorney Anet Castro met with Cortes in prison, and he executed an assignment of his rights to QBE in exchange for $25,000, which was to be paid to his daughter. Ex.64.
11. In August 2014, Attorney Anet Castro met again with Cortes in prison, and he executed an amended version of the assignment, which merely corrected the corporate name of QBE. Ex.64.
12. In May 2015, the Cardona lawsuit went to trial. In June 2015, the court entered judgment against Cortes for a total of $20,974,903.
13. In July 2015, the Cardonas sued QBE and Cortes seeking a declaration that the assignment was invalid. They later filed an amended complaint. Ex's 94, 100.
14. Cortes filed a cross-complaint against QBE for bad faith and elder abuse, and later filed an amended cross-complaint. Ex's 96, 102.
15. In early 2016, QBE agreed to rescind the assignment. ACM did not object to the rescission.
16. In their lawsuit against QBE, the Cardonas brought a motion to compel, seeking privileged documents from Alan Jampol, an attorney who had represented ACM. In February 2016, the court granted the motion, ruling that the crime-fraud exception to the attorney-client privilege applied. Ex.104.
17. In June 2016, QBE and ACM executed a stipulation regarding the potential settlement of the Cardona and Cortes lawsuit. Ex. 109[1].

---

[1] The full text of the stipulation found in Exhibit 109 is set forth below:

i.  In connection with the existing demand by the Cardona/Cortes parties ("Claimants") for $15 million, which is set to expire on July 1, 2016, the parties to this agreement agree as follows:

    a.  No party will contend that a settlement amount with Claimants, agreed to on or before July 1, 2016, in an amount not to exceed $15 million, is unreasonable. All parties will waive the right to assert that a settlement entered into on or before July 1, 2016, if any, in an amount of $15

**QBE v. ACM Final Award**
July 24, 2017
Page 3 of 23

18. In July 2016, QBE accepted an offer to settle the Cardona and Cortes lawsuits for $15 million, which amount has been paid in full.

## II.   QBE's Claims.

ACM was QBE's claims administrator and was responsible for handling claims under the policy. In 2011, Cortes got into an accident with and seriously injured 3 members of the Cardona family. The Cardonas sent a policy limits demand to ACM, with a short deadline for acceptance. ACM did not acknowledge receipt of the demand nor accept it within the deadline. It thereafter accepted the demand, but counsel for the Cardonas would not accept policy limits after the deadline had expired.

The claim did not settle, and the Cardonas eventually obtained a $22 million judgment against Cortes. The Cardonas then sued QBE for bad faith to recover the excess judgment, as well as interest, emotional distress damages, attorneys' fees, and punitive damages. Cortes sought rescission of the assignment as well as damages against QBE for breach of its implied covenant of good faith and fair dealing for failing to accept the initial Cardona demand, and for fraud in connection with the obtaining of the assignment. In light of this substantial exposure, QBE settled the lawsuit for $15 million.

Under its Claims Management Agreement with QBE, ACM is obligated to defend and indemnify QBE for any claim or damages arising from ACM's negligence or deficient performance of its duties under the Agreement. QBE argues that ACM's negligence and malfeasance created the extra-contractual exposure. QBE's Supplemental and Amended Arbitration Demand asserted the following claims:

> Declaratory Relief on duty to defend and duty to indemnify;
> Express Contractual Indemnity;
> Equitable Indemnity/Contribution;
> Breach of Contract;
> Breach of Implied Covenant of Good Faith and Fair Dealing;
> Intentional and Negligent Misrepresentations; and
> Breach of Fiduciary Duty.

--------

million or less, is not a good faith settlement. Thus, no party can challenge the amount of any settlement, assuming the settlement is agreed to with Claimants on or before July 1, 2016, in an amount not to exceed $15 million.

b. No party will assert that the other party acted as a volunteer by entering into any settlement described in paragraph 1.

c. In the arbitration between ACM and QBE, no party will assert that the other party did not suffer any damage by virtue of a settlement occurring as described in paragraph 1, in the event that some or all of the party's settlement funds were paid by the insurer for that party. In other words, QBE will not assert that ACM did not suffer damage because some portion of the settlement payment was made by its insurers. Similarly, ACM will not assert that QBE has not suffered damage because some portion of the settlement amount was paid by AIG on behalf of QBE.

QBE v. ACM Final Award
July 24, 2017
Page 4 of 23

On March 24, 2016, ACM filed an Answer and Counterdemand for a Declaration that QBE was required under the Agreement to reimburse ACM for its costs and fees incurred in connection with the Cardona litigation, as well as in the instant proceeding.

Prior to the hearing, QBE's causes of action for declaratory relief were withdrawn, and ACM's Counterdemand was withdrawn.

Paragraph V. (1) of the Agreement provides: "The law of the State of California shall govern the interpretation and application of this Agreement and the enforcement of the arbitration award." Paragraph V. (2), however, appears to be in potential conflict with V. (1). It states: "The arbitrators are relieved from all judicial formalities and may abstain from following the strict rules of law. They shall interpret this Agreement as an honorable engagement....".

Any confusion resulting from the language of Paragraph V (1) and (2) was resolved by a stipulation of the parties made both during the April and June hearings that the Panel was to resolve the matter in accordance with the law of the State of California.

### III.    In-Depth Look at Chronology of Key Events.

The auto accident in which QBE's insured, Cortes, hit and injured the Cardonas took place on February 6, 2011. Cortes was arrested at the scene for DUI; he was sent to jail, and then prison. The Cardonas' son Sandro retained counsel ("Parris") on their behalf on February 15.

Sandro Cardona sent a demand letter dated February 23, 2011 but postmarked February 25[2] to ACM, certified with return receipt requested[3] ("demand letter", Ex. 3). The demand letter attached a police report of the accident, and demanded policy limits in return for a full release of all 3 family members' claims against Cortes. The demand letter had a March 10, 2011 deadline, and included several other conditions, compliance with one of which would have required the cooperation of Cortes, who never reported the accident and could not be located.

When and whether ACM received the Cardona demand letter is in dispute. However, as noted above, ACM did stipulate that "On February 25, 2011, the demand, which was sent by certified mail, was delivered to ACM's P.O. Box in Carlsbad." [Stip. #6] Furthermore, the last page of Ex. 3 is the envelope in which the demand letter arrived at ACM, and it is stamped "Feb 28 2011."

On March 8, Sandro Cardona phoned ACM. According to his deposition, he told the person who answered that he had sent a letter and had not received a response, was told that ACM would look into it, and never heard back. [TR Vol 1, p. 16]. ACM created an electronic claim, or First Notice of Loss, based on the call, and assigned the claim, claim number 5708387, to claims adjuster Tyler Eison ("Eison"), Ex. 5.

---

[2] Ex. 4.

[3] Based on the fact that he had already met with Parris, and that he testified that he mailed a sealed envelope that he had not prepared, and based further on the sophistication of the demand and that the postage meter was in Lancaster, California, where the Parris firm is located, the Panel infers that Parris ghost-wrote the letter for Sandro Cardona to mail.

QBE v. ACM Final Award
July 24, 2017
Page 5 of 23

Eison first tried to reach Sandro Cardona on March 16, and ordered a police report on March 21. He spoke with the Parris office for the first time on March 28 and learned that Sandro Cardona had sent ACM a police report and demand letter. Eison located both documents and requested authorization to offer policy limits.

The next day, March 29, Katherine Moreland asked QBE's Michael Duffy for permission to offer policy limits, noting "We have not yet received a demand." Ex. 8. This was not true, since Eison had learned the day before from the Parris office of the demand letter, and had promptly located the letter and police report. In what would become a disturbing pattern, ACM also neglected to inform QBE that Sandro Cardona had called ACM on March 8 to follow up on his demand letter, that the demand letter expired on March 10, and that Eison failed to contact Cardona until March 16. In other words, ACM apparently chose to withhold from QBE evidence of its own negligent performance under the Agreement that, as Katherine Moreland would write on Eison's Written Warning on April 18th, had potentially exposed ACM to hundreds of thousands, if not millions of dollars for bad faith.

When QBE authorized a policy limits offer later that day, Eison offered it to the Parris office immediately. Ex. 9. The Parris firm rejected the offer on April 11, and noted that it would probably request $500,000 to settle just one of the claimants.

Moreland prepared an undated Written Warning[4] documenting Eison's performance deficiencies on six claim files, including #5708387, that had occurred since his Counseling in December 2010. With regard to claim #5708387 she wrote, "Our failure to respond to this demand, has the potential for an excess exposure to the insured of hundreds of thousands and perhaps millions of dollars which could result in a bad faith claim against ACM."

Thereafter on April 13, Phil Allen ("Allen"), an ACM Litigation Supervisor, asked Marcos Labayen ("Labayen"), a Claims Supervisor, to create a timeline on the file in preparation for a roundtable with QBE's counsel the following day. Labayen created the timeline that evening. Ex. 10.

On May 6, 2011, Allen created a summary of the facts for QBE[5] about claim #5708387 in preparation for a teleconference about this "problem file" [Ex. 13] but seemingly misdirected QBE by stating that an offer of policy limits was sent on March 28 "without the affidavit of no other insurance," implying that the lack of an affidavit was the reason for the subsequent rejection, thus continuing to keep QBE in the dark about the risk of a bad faith claim. Allen's summary concluded that Parris would probably file suit and would not accept policy limits, and offered the suggestion of Michael Hardiman, coverage counsel, that QBE consider filing a federal Declaratory Relief Action ("DRA") on the issue of potential excess exposure.

On September 13, 2011, QBE, by now aware of the true sequence of events, asked ACM to put its E&O carrier on notice of "the potential claim regarding ACM's claims handling of the Cardona Claim" and requested that ACM assure QBE that ACM would defend and indemnify QBE for any litigation arising

---

[4] The testimony was unclear as to the exact date of Eison's termination, TR. 208, 290, which is not as material as the language used in his write-up or termination documentation, Ex. 12.
[5] Labayen's timeline was not shared with QBE, nor was it included in the "complete claim file" Allen sent to QBE on May 9. [Ex. 14]

QBE v. ACM Final Award
July 24, 2017
Page 6 of 23

from ACM's claims-handling on the Cardona claim, and fund any litigation in which QBE might have to participate. [Ex. 18]

On May 22, 2012, Parris offered to go to mediation, but without policy limits. Ex. 28. QBE suggested to Dhara Patel ("Patel"), then the Senior Vice President of ACM, that they agree to mediate, if only to learn more about the claim. [Ex. 30]

Based on the advice that Peter Senuty ("Senuty"), an insurance coverage expert with Knapp, Petersen and Clarke, gave to Patel on June 22, 2012, QBE determined that it was unlikely that policy limits had been opened up, and QBE therefore decided not to mediate with Parris. [Ex. 32]

On November 30, 2012, *Cardona v. Cortes* was filed. [Ex. 38] By March of 2014, the Cardonas were offering to settle for $1.8 million and suggested a mediation. Robert K. Schraner, General Counsel of ACM's parent company, Arrowhead General Insurance Agency, Inc., acknowledged ACM's obligation to defend and indemnify QBE for liability or damages resulting from ACM's acts, should such liability arise. But, he noted, since there was no finding of liability by QBE as a result of ACM's actions, and ACM's position was that it had done nothing which could be construed as bad faith, ACM instructed QBE to offer nothing in excess of the policy limits at a mediation. [Ex. 45]

In April 2014, Alan R. Jampol ("Jampol"), ACM's coverage counsel regarding the *Cardona v. Cortes* claim until replaced by Brown & Brown, proposed that ACM contact Cortes in prison to purchase an assignment of his rights under the policy, writing, "I have done this successfully on many occasions in the past.[6]" Ex. 48. Should that fail, Jampol proposed to bring a federal DRA against Cortes, and if appropriate, the Cardonas, on behalf of QBE. He reiterated ACM's position that it had no obligation to defend or indemnify QBE, or to pay for Cortes' defense in the *Cardona v. Cortes* matter, unless QBE suffered a loss caused by ACM. Nonetheless, he conveyed ACM's offer to advance the funds to accomplish the above, subject to a possible later reallocation between the parties.

Wary of Jampol's assignment proposal, QBE agreed that ACM could proceed with the Cortes visit, but that ACM, and not QBE, would be responsible for any adverse consequences of such an attempt. [Ex. 49] During the summer of 2014, a bilingual attorney, Anet Castro, visited Cortes in prison and obtained his assignment.

Thereafter, a mediation took place in April 2014 at which QBE maintained that it had done nothing wrong in handling the claim. ACM had recommended a $100,000 offer, but the Cardonas demanded $15 million. Neither QBE or ACM thought the claims were worth anywhere near that amount.

---

[6] Jampol's full representation to QBE regarding purchasing an assignment of Cortes' rights under the policy is as follows: "I have done this successfully on many occasions in the past. I know of no reason why Mr. Cortes cannot legally assign his right to QBE (or ACM), and I believe that there are reasons why Mr. Cortes would agree to such a purchase even though it will leave him subject to a large judgment in favor of the Cardonas . . . "

QBE v. ACM Final Award
July 24, 2017
Page 7 of 23

In advance of a September 16, 2014 mediation requested by the Cardonas, ACM and QBE learned that the senior Cardona's IME showed that his claimed neurological injuries were pre-existing, so that the value of his claim was only one to two million dollars. QBE disagreed with ACM's recommendation that the mediator be advised of the assignment, and therefore it was not disclosed[7] When the mediator signaled that the Cardonas would be willing to settle in the $500,000 to $2.5 million range, both ACM and QBE stated that they were not interested in negotiations in that range.

On January 8, 2015, the Cardonas served three 998's totaling $5,249,999.97, expiring February 10. [Ex. 73] Cortes' counsel, Steve Belilove ("Belilove") estimated that the likely jury value of the claims was in the range of $1.5 - $2.4 million. [Ex. 67] QBE asked ACM's E&O carrier to accept the two largest 998 offers and pay $4,999,999.98, which was within its policy limits. [Ex. 76.] Notably, QBE did not attempt to negotiate with the Cardonas to reduce the amount of their 998's.

Having become increasing active on behalf of ACM, on March 4, 2015 Jampol sent a letter to White stating that if QBE settled for more than the policy limits, "QBE [would have] acted as a volunteer and, therefore, ACM was not required to indemnify" for any loss. (Ex. 77); (Schraner 483:13-484:6). Conversely, ACM, through Jampol, assured QBE that "if QBE did nothing to settle the Cardona claim then it could rest assured that if, in fact, it was found liable for bad faith because of ACM's misconduct, ACM would be there to honor its contractual obligations." (Schraner 484:7-13).

In May 2015, the Cardona lawsuit went to trial. In June 2015, the court entered judgment against Cortes for a total of $20,974,903.

On June 17, 2015 Parris, on behalf of the Cardona plaintiffs, offered to refrain from enforcing the judgment against Cortes in exchange for assignment of his bad faith claim against QBE and a waiver of his right of appeal. [Ex. 88]. Upon learning that Cortes had previously assigned his rights to QBE and was unable to make an assignment to them, the Cardonas filed a DRA in state court in Lancaster, California wherein they sought an order declaring the Cortes assignment invalid. [Ex. 94]

On August 3, 2015, QBE demanded ACM provide a defense, indemnify and hold QBE harmless regarding the Cardona DRA Litigation. And on September 3, 2015, Cortes filed a cross-complaint against QBE in the state court action claiming that his assignment to QBE was obtained in bad faith, constituted elder abuse and other related causes of action.

On September 11, 2015, QBE commenced the within proceeding by filing its demand for arbitration against ACM seeking indemnity and payment for all amounts expended in connection with the Cardona claims.

During a hearing in the state court action in Lancaster in February 2016, Judge Rogers ruled that (1) QBE's failure to accept the settlement demand gave Cortes a multimillion dollar bad faith

---

[7] Belilove finessed the issue by telling the mediator that based on his conversations with Mr. Cortes, there was no possibility he would assign any bad faith rights to the Cardonas.

QBE v. ACM Final Award
July 24, 2017
Page 8 of 23

claim; and (2) the manner in which the assignment was obtained was sufficient to "support a prima facie claim for fraud.[8]" [Ex. 104, pp. 5-6; Ex. 97, pp. 4-5]

In July 2016, QBE accepted an offer to settle the Cardona and Cortes lawsuits for $15 million, which amount has been paid in full. Prior to the payment, ACM and QBE had stipulated that $15 million was a reasonable settlement. [Ex.109]

IV.   **ANALYSIS OF QBE'S CLAIMS.**

    I.   **Breach of CMA.**

QBE alleges that ACM failed to comply with the Agreement by not performing its responsibilities thereunder "according to generally accepted procedures normally followed in the insurance claims business and specifically according to the operations and procedures of ACM." Ex. 1 (A)(1). QBE identifies a plethora of acts that ACM failed to perform with respect to claim #5708387, many of which are admitted by ACM's witnesses:

- Open a claim immediately when notified of an accident. (Patel TR 278:3-14.)
- Record each claim and set a reserve promptly. (Patel TR 278:15-279:7.)
- Note in the claim file when a claim is first received. (Patel TR 282:18-25.)
- Immediately forward a demand to a supervisor. (Labayen TR 27:25-28:5; Patel TR 294:1-10.)
- Note in the claim file when a demand was first received. (Patel TR 283:1-8; Stern TR 583:3-6.)
- Ensure that a demand itself is date-stamped by the mail room. (Patel TR 184:15-25.)
- Evaluate a policy limits demand as soon as it is received. (Patel TR 285:13-20.)
- Respond to the demand or request an extension of time. (Patel TR 159:1-7 & 285:21-286:3; Walker TR 391:10-392:22; Stern TR 582:8-18.)
- Have its adjuster (Eison) contact the Cardonas on March 8, 2011 - the day he received the claim. (Labayen TR 28:10-19; Patel TR 207:3-5, 207:22-208:7, & 209:14-210:3; Walker TR 393:20-395:12; Stern TR 584:17-585:3.)
- Immediately notify QBE that a policy limits demand was made. (Stern TR 583:7-11.)
- Promptly inform QBE of a demand that had not been timely accepted. (Patel TR 297:6-16; Stern TR 583:12-17.)

Additionally, QBE asserts that ACM violated several other standards of performance:

---

[8] Judge Rogers based his finding of a prima facie claim for fraud on the fact that the attorney sent to obtain Cortes' assignment did not explain to Cortes what claims he might have against QBE, and in fact affirmatively suggested that no such rights existed; that she did not assert that she informed Cortes of Cardonas' policy-limits settlement offer, and his liability as a result of his carrier's failure to timely accept that offer; and her failure to inform Cortes of the value of the assignment, and how QBE's and Cortes' interests were in conflict. Ex. 104

**QBE v. ACM Final Award**
July 24, 2017
Page **9** of 23

- ACM violated its duty not to assert that it had the right to control steps taken by QBE to mitigate bad faith exposure. (Patel TR 298:6-299:19; Stern TR 587:15-22.)
- ACM also violated its obligation not to exert influence over whether QBE should settle a claim for more than the policy limits. (Patel TR 300:16-301:11; Stern TR 587:7-14.)

ACM was on notice of the demand letter on February 28: the envelope was stamped *FEB 28 2011* by the mail room[9]. ACM received a March 8 call from Sandro Cardona following up on his demand. Eison was required to contact him within 24 hours, but did not. [Labayen TR. 28.] A supervisor was to have been notified immediately. The person who told Sandro Cardona that he would receive a call back did not call back. It was only because Perris' office called that ACM finally located the time limit demand letter and police report 30 days after they were actually received by ACM. ACM did not respond, request additional time or even acknowledge receipt of the demand letter.

QBE's expert, Timothy L. Walker, opined that ACM not only failed to comply with its own procedures for stamping letters received, logging in demands, etc., it also failed to properly investigate the circumstances surrounding its failure to timely respond to the demand letter to identify whether this was a simple clerical error that might constitute a defense to a bad faith claim. This failure on the part of ACM violates industry standards, with the result of severely limiting "QBE's ability to have any hope of successfully defending this extra-contractual claim down the road." (Walker TR 400-403) Walker also believes that there was a concerted, if tacit, effort to keep the file devoid of any reference to when the demand letter was found.

> Nowhere in the file at this time, either on March 28th or March 29th and for that matter at any other time after that within a relatively short period of time, is this demand letter even referenced. So that leads me to believe that they were not being entirely candid with QBE with regard to what they knew and when they knew it.

[Walker TR. 405] In short, Walker believes that this failure to document its belated discovery of the demand letter and withholding this information from QBE was intentional on ACM's part, and that ACM's claims handling fell below industry standards with respect to its disclosure of facts to QBE.

Walker described as "disingenuous" Katherine Moreland's March 29 e-mail to QBE, stating that no demand had been received, when the prior day, her direct report Labayen had found the demand letter in the FNOL department. Further, notes Walker, while Labayen documented that on March 28, "'Kent [from the Parris office] said that the claimants sent us the police report prior to their representation.' And he goes and finds the letter, he says, with the police report, and he comes back and he calls Kent back. Nowhere in his file does he document at that time that he found the letter. He just simply says, 'Called Kent back and offered the limits.'" [Walker, TR 403-405.] The

---

[9] In light of this incontrovertible fact, documented in numerous places in ACM's files, e.g., Ex's. 3, 10 and 12, as well as by way of Stipulation 6, that the demand letter was delivered to ACM on February 25, the Panel is surprised and disturbed by ACM's position at the hearing that the demand letter and police report were *not* received by ACM on February 28. This tactic considerably undermined ACM's credibility in this proceeding.

**QBE v. ACM Final Award**
July 24, 2017
Page **10** of **23**

Panel was impressed with Labayen's credibility and so does not go so far as to determine that Labayen intentionally failed to properly document the file with regard to his discovery of the demand letter in FNOL on March 28, but agrees with Walker that ACM's lack of candor with QBE is stunning.

The Panel agrees with Walker that the information upon which QBE based its determinations on how to proceed in the face of the Cardonas' seemingly exorbitant settlement demands was inadequate and misleading. Another example is the Senuty opinion letter, Ex. 32. ACM retained Senuty to give a coverage opinion, to be shared with QBE. However, the information provided to Senuty was also inadequate and misleading. Senuty's timeline, particularly the entry for March 8, 2011, demonstrates his ignorance of critically important facts known to ACM by then, including that ACM had received the demand letter and policy report before the expiration of the policy limits demand, that Sandro Cardona had called on March 8 to inquire about the status of his demand letter, and that Eison waited 8 days between the time he received the claim file and the time he reached out to the insured and the claimants, thus blowing the deadline.

QBE asserts that these deficiencies and obfuscation created a risk that the cap was off the policy, and QBE therefore had a risk of extra-contractual liability for bad faith failure to accept a policy limits demand. After the trial, QBE's potential exposure was well over $50 million[10].

There appears to be agreement, even on the part of ACM and their experts, that ACM's conduct exposed QBE to the risk of extra-contractual liability. Senuty, for example, who did not even have the full picture, opined that "There is a risk of a trier of fact concluding QBE acted tortiously in failing to note and timely respond to the February 28 demand . . ." Ex. 32, p. 16.

David Stern, ACM's expert on the standard of care between third-party administrators and insurance carriers, admitted as much, and more, on cross:

> Q And you would agree that if the Cardonas' settlement demand letter was actually delivered to ACM on February 28, 2011, then ACM's conduct in connection with that demand created a risk that QBE would be liable for extra contractual damages? A If they received it on that date, generally yes.
> Q And, in fact, you would even go so far as to say that, if the Cardonas' demand letter was actually delivered to ACM on February 28, 2011, then it would have been unreasonable for ACM to deny any wrongdoing; correct?
> A Generally, yes.

---

[10] QBE calculates its potential liability, had it not settled, as follows: $21 million judgment in favor of the Cardonas, Pre-judgment interest of over $1+ million due to failure to accept §998 offers, Post-judgment interest of $4+ million by the time the bad faith case would have gone to trial in June 2017; Unknown judgment in favor of Cortes for bad faith, fraud, and elder abuse, and Attorneys' fees under Brandt and on Cortes's elder abuse claim, which would have been 40% of the judgment plus interest ($26 million) - i.e., another $10 million. Emotional distress and punitive damages were both likely given (i) Cortes's status as a senior citizen, and (ii) the court's finding that fraud had occurred. And because Cortes was a senior citizen, punitive damages could have been trebled under Civil Code §3345.

**QBE v. ACM Final Award**
July 24, 2017
Page 11 of 23

> Q And, in fact, would you also agree that if ACM had received the policy limits demand letter on
> February 28, 2011, it would have been unreasonable for ACM to take the position that the claim should not be settled for more than the policy limits?
> A Would it be unreasonable? Well, generally, yes.
> Q And . . . Under industry standards that governed ACM's conduct, it would have been inappropriate for ACM to take the position that, if QBE settled for more than the policy limits, then ACM would challenge any attempt by QBE to seek indemnity for that payment from ACM. True?
> A . . .
> Q . . . You would agree that under those standards it would never have been appropriate for ACM to take the position that, if QBE settled for more than the policy limits, then ACM would challenge any attempt by QBE to seek indemnity for that payment from ACM. Correct?
> A Generally, yes.
> Q And it also would never have been appropriate for ACM to take the position with QBE that ACM had a right to control steps that were being taken to mitigate bad faith exposure?
> A . . . Yes.

[Stern TR 585 – 587] Even Patel, when asked whether, if ACM had received the demand letter on February 28, its failure to respond by the deadline "created a risk that the cap was lifted from the insurance policy," admitted it would. Patel TR 158:11-25.

With regard to the ill-conceived assignment that Jampol masterminded, his assurances about having done this successfully on many occasions in the past, *see* fn. 6 above, were belied by his testimony on cross-examination:

> A Yeah, they were a little different. The insured there was typically more sophisticated and certainly not in prison.
> Q And just to clarify, in the prior assignments that you've been involved in, those were assignments
> that occurred in connection with professional liability insurance, specifically lawyers' liability insurance; correct?
> A The two that I remember were, yes.
> Q And in those cases, you were representing Lloyd's of London, I believe, who was insuring an attorney that had been sued for malpractice; correct?
> A Representing -- technically it's the underwriters of Lloyd's. Lloyd's itself is not an insurer. But, yes, I was coverage counsel for the underwriters.
> Q And the circumstances in those cases that led to the assignments were that Lloyd's of London felt that there was exposure to the insured lawyer, but the insured lawyer disagreed with that conclusion by the underwriters; correct?
> A In at least one of them, yes. I'm not sure I remember the exact circumstances of the second one, but I do remember that being the case in one of those two.
> Q And so what happened in those cases was that the underwriters at Lloyd's approached the lawyer insured and said, we'll tell you what. We think we have

**QBE v. ACM Final Award**
July 24, 2017
Page **12** of **23**

exposure. You don't think you do. Here's what we'll do. We'll buy back our
insurance policy, give you the money, and you can use that money however you
see fit, to either use it to finance a defense or use it to settle the claim or use it for
whatever other reason you want essentially; correct?
A Yes.
Q And those prior cases that involved assignments did not involve a situation where
the insurance company had failed to settle within policy limits when it had been
arguably given an opportunity to do so; correct?
A That's right.
Q And so weren't cases that involved bad faith allegations against an insurance
company; correct?
A I'm not sure that's correct. I think there were allegations that the insurance
company was not handling the case properly and was not -- I just don't recall the
details, but certainly I think the issue of bad faith did come up in those cases.
Q And in those cases, the difference of opinion between the insurance company
and the insured was that the insurance company wanted to pay money to settle the
claim, and the insured did not; correct?
A I believe so at least in one of them.

Based on the above evidence, the Panel finds that QBE has proven its prima facie case that ACM
was deficient in its performance of its responsibilities to QBE under the Agreement.

ACM pled as an affirmative defense QBE's alleged failure to mitigate its damages. The burden is
on ACM to prove QBE's alleged failure to mitigate its damages. *Brandon & Tibbs*, (1990) 226
Cal.App.3d 442. Thus, to prevail on its breach of contract claim, QBE must also prove that it made
reasonable efforts to avoid harm. The duty to mitigate damages does not, however, require QBE
to do what is unreasonable or impracticable. "The rule of mitigation of damages has no application
where its effect would be to require the innocent party to sacrifice and surrender important and
valuable rights." *Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App. 4th 1686, 1691.

In its Closing Response Brief, pp. 23 - 24, ACM identifies the following conduct that it contends
demonstrates that QBE failed to mitigate its damages:

• QBE declined to file a DRA regarding any bad faith claim, which would have potentially
resolved the issue of extra-contractual damages entirely and which would have certainly provided
the advantage of being in Federal Court, despite repeated entreaties from ACM and
recommendations from outside coverage counsel that it do so.

• QBE would not agree to mediate without regard to the policy limits in May 2012.

• QBE showed no willingness to consider the recommendation of the mediator and offer
money during the two mediations in April and September 2014, in violation of industry standards
and its obligation as the insurer to settle the claim, even when excess amounts were at play.

**QBE v. ACM Final Award**
July 24, 2017
Page 13 of 23

- QBE refused to accept any of the three 998 offers, totaling $5.25 million, prior to their expiration on February 10, 2015.

- QBE failed to rescind the assignment agreement, in its name, when asked to by the attorneys for the Cardonas and Mr. Cortes. According to ACM, even though QBE argues that the assignment created an independent risk that QBE would be held liable for the unexpected $21 million excess judgment and further tort damages, this alleged "independent risk" could have been avoided had QBE rescinded the assignment agreement before July 14, 2015 when the Cardonas filed a DRA action against QBE and Mr. Cortes in Lancaster to invalidate the assignment. This "independent risk" also could have been avoided had QBE rescinded the assignment agreement before September 3, 2015 when Mr. Cortes filed a cross-complaint against QBE.

QBE argues that ACM failed to sustain its burden of proving failure to mitigate, citing the following case law and facts in support of the course of action it took.

The doctrine does not require the injured party to take measures which are unreasonable or impractical . . . (*Jordan v. Talbot, supra*, 55 Cal.2d 597, 611; *Valencia v. Shell Oil Co., supra*, 23 Cal.2d 840, 846; Schultz v. Town of Lakeport, supra, 5 Cal.2d 377, 384; *Joerger v. Pacific Gas & Elec. Co.*, 207 Cal. 8, 28 [276 P. 1017]; 2 Witkin, Summary of Cal. Law (1960), p. 1608.) The reasonableness of the efforts of the injured party must be judged in the light of the situation confronting him at the time the loss was threatened and not by the judgment of hindsight. (*Basin Oil Co. v. Baash-Ross Tool Co.*, 125 Cal.App.2d 578, 602-603 [271 P.2d 122]; [261 Cal.App.2d 397] McCormick, Damages, pp. 133-134; Sedgwick, Damages, § 221, p. 415.) The fact that reasonable measures other than the one taken would have avoided damage is not, in and of itself, proof of the fact that the one taken, though unsuccessful, was unreasonable. (*Basin Oil Co. v. Baash-Ross Tool Co., supra*, at p. 602-603.) "If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen." (*Green v. Smith*, 261 Cal. App. 2d 392, 397 (1968) [rejecting the defendant's failure to mitigate defense]; McCormick, Damages, p. 134.) It is sufficient if he acts reasonably and with due diligence, in good faith. (*Basin Oil Co. v. Baash-Ross Tool Co., supra*, 125 Cal.App.2d 578, 602; *Marshall v. Ransome Concrete Co.*, 33 Cal.App. 782, 786 [166 P. 846].)

Addressing ACM's argument that QBE failed to mitigate because it refused to file a DRA, QBE points out that counsel were not unqualifiedly in favor because of the downside inherent in suing one's insured. Further, there was no way to know whether a federal district court would have heard the DRA before the trial of the underlying traffic accident, nor whether it would have ruled as a matter of law in favor of QBE. In fact, given the Lancaster judge's determination, in retrospect, the chances of the DRA going against QBE are fairly good.

QBE argues that it would have been very risky to agree to mediate above policy limits in May 2012, when the most seriously-injured plaintiff would not be participating because he was still treating. Besides, ACM gave QBE the conflicting directive not to offer to settle in excess of policy limits. Thus, the Panel finds that refusing to participate in a May 2012 mediation was not in derogation of QBE's obligation to mitigate its damages. The same rationale applies to QBE's

**QBE v. ACM Final Award**
July 24, 2017
Page **14** of **23**

failure to accept any of the 998 offers totaling $5.25 million, or to agree to let the mediator make a proposal in the $500,000 to $250,000 bracket. Rather, these decisions were within the zone of reasonable actions on QBE's part.

ACM threatened that, if QBE paid more than the policy limits to settle the claims, ACM would withhold indemnity based on the theory that QBE acted as a "volunteer," which is exactly what ACM ended up doing anyway, notwithstanding the stipulation it entered into essentially authorizing QBE to enter into the $15 million settlement. Conversely, ACM had assured QBE that if it didn't settle in excess of policy limits, ACM would indemnify QBE for any extra-contractual liability. Based on this threat and promise, QBE did not accept the Cardonas' $5.25 million section 998 offers. ACM acknowledges that the three 998 offers totaling more than $5 million were more than double the outside exposure that defense counsel valued the case at, i.e., between $1.5 million and $2.4 million (Ex. 67, p.3). Nor did ACM did encourage QBE to pay that amount when it was offered. In fact, its prohibition of paying more than policy limits remained in place until the unfavorable verdict was rendered.

Thus, it is clear that ACM presented QBE with two lose/lose options. The first—let ACM call the shots, on pain of losing its indemnification, or pay what appeared at the time to be unreasonable settlement demands and likely get into a costly, risky fight with ACM for indemnity. The Panel finds that ACM's hindsight arguments that ACM hypothetically could or should have paid the Cardonas' 998 demands are not persuasive in light of ACM's contrary contemporaneous messaging and QBE's reasonable conduct in light of the bind ACM put it in. ACM cannot now assert that QBE should have mitigated its damages by paying more than the limits.

Asserting that QBE should have mitigated its damages by rescinding the assignment when the Cardonas' attorney requested it, fails to take into account that that request came with unacceptable strings, including giving up the right to appeal the Cardona v. Cortes verdict. The Panel finds that ACM failed to protect QBE from extra-contractual liability and concealed information that QBE would have needed to independently assess its risk and protect itself from extra-contractual liability to its insured. The Panel further finds that the ill-fated assignment from Cortes to QBE of his rights under the policy actually increased QBE's exposure to extra-contractual liability, since, among other things, Cortes did not have a lawyer to represent him when QBE's lawyer met with him in prison, and for the reasons identified by Judge Rogers in determining that Cortes had made out a prime facie claim for bad faith based on the assignment. Here, too, ACM, through its counsel Jampol, misrepresented its counsel's prior success with this type of assignment when trying to persuade QBE to agree to ACM's attempt to obtain an assignment in its name.

Because we award QBE the remedy it seeks under its breach of contract claim, QBE's alternative claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is moot.

**QBE v. ACM Final Award**
July 24, 2017
Page **15** of **23**

### V.       Contractual Indemnity Under CMA.

QBE contends that ACM's malfeasance exposed QBE to extracontractual liability, and that ACM is thus obligated to indemnify QBE for the $15 million settlement and to pay QBE's legal fees. The scope of ACM's duty to indemnify QBE is contained in ¶S of the Agreement. Ex. 1:

> ACM agrees to indemnify defend and hold [QBE] harmless from and against any and all claims, demands, actions, proceedings, losses, damages, costs and expenses (including attorneys' fees), and regulatory fines or charges, made or instituted against, or incurred by [QBE] and arising out of or in connection with any negligence or deficiency of performance hereunder by ACM.

White testified that ACM's duty to defend arose when ACM performed negligently or deficiently. "ACM said we will defend, indemnify, hold harmless QBE in instances where ACM is negligent or engages in deficient performance." White TR 131.

ACM argued that even a substantial risk of extra-contractual exposure does not trigger the duty to indemnify QBE, and that since QBE was never determined to be liable for bad faith failure to settle, no duty to indemnify ever arose.

ACM asserts with regard to contractual indemnity, as it has with regard to its defense of other claims herein, that ACM's actions did not, as a matter of law, create any bad faith exposure for QBE. Reasons offered by ACM include the fact that the time limit demand offered an unreasonably short time to accept, QBE/ACM could not comply with all the conditions thereof before it expired, QBE's insured, Cortes, never reported the accident to ACM and there was no way to get hold of him. ACM contends that its tender of policy limits 28 days after the demand was reasonable under the circumstances and in accordance with the California Regs, and coverage counsel Senuty's opinion letter opined that the unreasonably short time limits made it unlikely that there could be a finding of bad faith.

A strict reading of this provision confirms ACM's position that the duty to defend did not arise when ACM's conduct merely gave rise to the possibility of a bad faith claim. Its conduct must have given rise to a claim, demand, etc.

QBE argued that when Judge Rogers declared the assignment was fraudulent, the bad faith lawsuit became virtually unwinnable.

At oral argument, ACM clarified that under its interpretation of the ACM, it is not until payment of the settlement that the duty of indemnification is triggered. TR 9:17 – 10:6.

The Panel finds that once the settlement amount was paid, and here it was agreed that the amount was reasonable under the circumstances, the duty to indemnify ripened, and ACM became liable for QBE's attorney's fees incurred in the within proceeding.

**QBE v. ACM Final Award**
July 24, 2017
Page **16** of **23**

Because we award QBE the remedy it seeks under its contractual indemnity claim—attorney's fees and costs incurred in this proceeding, QBE's alternative claim for equitable indemnity is moot.

### VI.    Punitive Damages.

QBE asserts that ACM breached its **fiduciary duty, engaged in fraud and misrepresentation, and breached the implied covenant of good faith and fair dealing,** and that some of its conduct was willful and fraudulent, warranting the imposition of punitive damages. QBE contends that ACM's conduct in forcing QBE to participate in the ill-fated assignment in order to preserve its contractual rights for indemnity from ACM, constitutes an independent tort for which punitive damages should be awarded.

In its Opening Post-Arbitration Brief at p. 27, QBE summarizes the precarious legal position into which it alleges ACM willfully placed it:

> . . . ACM sought to hide and/or minimize its malfeasance in order to avoid honoring its indemnity obligations to QBE. Not only was this a flagrant breach of the fiduciary duty ACM owed to QBE, it constitutes fraud under Civil Code section 3294(c)(3). . . [W]ithholding this information was particularly pernicious because they further increased the exposure that QBE would have faced had it gone to trial in the bad faith action. ACM's fraudulent attempts to conceal its own culpability would have been attributed to QBE, and would have provided the jury with another justification – separate and apart from the failure to settle and assignment issues - to award punitive damages.
>
> ACM's mishandling of the settlement demand, procurement of the assignment, and other misconduct created - and then exacerbated - the bad faith exposure that QBE had to pay $15 million to settle.

Other acts QBE claims should subject ACM to an award of punitive damages are the following:

- QBE alleges that when ACM first reported the claim to QBE, it misrepresented that everything was done right on the claim and that there was no demand, when that was not the case. Patel attempted to substantiate ACM's position that as of March 29, 2011, when ACM emailed QBE on and stated that no demand had been made by the Cardonas, there was no reference to a demand letter anywhere in the claim file, and ACM was merely informing QBE of the facts as ACM understood them on that date. (Patel TR 242:22-243:10.) The Panel agrees that ACM did not provide complete claim file information to QBE.

- QBE alleges that ACM did not inform QBE that it had terminated Tyler Eison for mishandling the claim. ACM, on the other hand, argues it was not obligated to inform QBE of personnel decisions it made. (Patel TR, 210:4-11.) Ex.12 supports ACM's contention that his mishandling of the Cardona claim was only one of the reasons Mr. Eison was terminated. (TR Patel, 207:22-208:7) The Panel disagrees that Eison's termination should have been disclosed.

QBE v. ACM Final Award
July 24, 2017
Page 17 of 23

- QBE alleges that ACM concealed from QBE that Sandro Cardona mentioned the demand letter he had sent during his March 8, 2011 call to ACM. ACM denies that this occurred, citing Ex. 5, p. 1. (Patel TR, 248:24-249:5) The Panel agrees that this is critical information that should have been promptly disclosed.

- QBE alleges that ACM never provided it with Mr. Labayen's timeline, which contained data that was not in any of the documents or accounts ACM provided to QBE. ACM asserts that Labayen's timeline was an internal document and there was no obligation to turn it over, and further, when ACM notified QBE of the claim and provided it with a summary of the file, the material Mr. Labayen's timeline was contained in the summary provided, but in a more narrative fashion. (Patel TR, 171:4-17) The Panel disagrees with ACM regarding its transparency. The Panel believes the timeline was sufficiently related to the claim that it should have been turned over to QBE as part of the claim file.

- QBE alleges that ACM repeatedly told it that ACM did nothing that could be construed as bad faith and there was no reason to fear bad faith. (Ex. 48, p. 2; Ex. 77, p.2). But as early as April 2011, it recognized that its "failure to respond to the demand has the potential for an excess exposure to the insured of hundreds of thousands and perhaps millions of dollars which could result in a bad faith claim against ACM." (Ex. 12) ACM never shared this internal conclusion with QBE. ACM points out that it took the same position at the hearing, so there was no misrepresentation. The Panel believes that while ACM may not have had an affirmative obligation to advise QBE that it may have created significant exposure, ACM was required not to deny that it had created exposure when it clearly had.

- Notwithstanding its express agreement not to do so, Ex. 109 ¶2, ACM claimed that QBE acted as a volunteer when it settled the Cardona litigation for $15 million. Had QBE not entered into and paid the $15 million Cardona settlement, ACM might well have been looking at an award against it in the range of $68 million or more. The Panel finds it reprehensible that ACM would attempt to sandbag QBE after expressly agreeing not to take the position that QBE was a volunteer.

- QBE asserts that ACM's telling QBE that if it didn't allow ACM to handle the assignment and cap off/extracontractual liability issues in whatever manner they deemed fit, that it would be a breach of the contract and QBE would have waived any right or ability to seek recourse from ACM is inconsistent with ACM's role as QBE's fiduciary and agent. Along the same lines, QBE alleges that ACM's false promises to indemnify QBE if it approved the assignment and to indemnify QBE if it did not settle for more than policy limits, constitute additional proof of ACM's conduct that merits the imposition of punitive damages.

  As QBE stated in its closing argument, "QBE did everything that ACM told it had to do in order to be ensured of getting indemnity. And after all that, it still isn't getting indemnity. It's not even getting its defense costs. And it's outrageous. And that's the reason that we put the punitive damages claim in." TR p. 23, line 3.

Under the CMA, ACM was given the power to act as QBE's agent with respect to claims, and required to "diligently manage and pursue the prompt, fair, and just settlement or defense of all

**QBE v. ACM Final Award**
July 24, 2017
Page **18** of **23**

Claims in [QBE's] best interest." Ex. 1, p. 1 § B(l) Therefore, argues QBE, ACM was QBE's fiduciary. "An agent is a fiduciary." *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1579 (1994); *Recorded Picture Co. v. Nelson Entm't, Inc.*, 53 Cal. App. 4th 350, 369-70 (1997). "A fiduciary relationship is any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party.'" *Wolf v. Superior Court*, 106 Cal. App. 4th 625, 29 (2003) (internal quotation omitted).

Fraud is defined under Civ. Code § 3294(c)(3) as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." It also constitutes malice because it is "conduct which is intended to cause injury to the plaintiff." Civ. Code § 3294(c)(1).

Although QBE presented no direct evidence of ACM's intent not to perform its promises, QBE argues that fraudulent intent can be inferred from ACM's conduct, including its "hasty repudiation of the promise" and "failure even to attempt performance." *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985). Here, although ACM promised to indemnify QBE if didn't settle for more than the limits, it repudiated that promise just weeks after the 998 offers expired - and even before the *Cardona v. Cortes* case went to trial. On April 27, 2015, Jampol told QBE that it had "waived its right to indemnity" and was "estopped to assert any claim for indemnity." (Ex. 82, p. 1.)

That ACM might have made a second representation of intent to indemnify if QBE did not offer more than policy limits in settlement, that representation was merely a restatement of an existing contractual liability, and did not create a new agreement.

ACM is correct that QBE's misrepresentation claims deal with Brown & Brown's appointment of "courtesy counsel" and nothing more. Therefore, the Panel finds that QBE is not entitled to punitive damages under its misrepresentation claims.

From the record presented there is much to be critical of ACM for. The Panel finds it egregious that ACM has repeatedly tried to conceal and misrepresent the fact of timely receipt of the letter demand from the Cardonas. ACM's attempts to control QBE's conduct of the Cardona litigation was, according to its own expert, wrong. From its first report to QBE right up to and through the presentation of evidence in this arbitration, ACM has denied the obvious. The testimony suggesting that the absence of a certain type of date stamp demonstrates non-receipt by ACM, for example, shows an utter disregard for the actual record of events, for QBE and for the Panel, and was easily impeached. As QBE's counsel stated at oral argument, "we shouldn't be litigating this case." TR. p. 23, 16:17.

Nonetheless, the Panel declines to award punitive damages against ACM.

## VII.   Damages

QBE, having established its right to recover for ACM's repeated breaches of the Agreement, seeks recovery of all of the damages that were foreseeable as a result of the mishandling of the Cortes/Cardona claims.

**QBE v. ACM Final Award**
July 24, 2017
Page **19** of **23**

### 1.  Compensatory Damages

Civil Code section 3300 provides: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all of the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."   "The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance.  The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised." *Brandon & Tibbs, v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 449, 455.

The starting point for the Panel's analysis of contract damages is with ACM's failure to timely review the letter demand, timely respond thereto and ultimately pay policy limits on behalf of Cortes. Had it done so, QBE would have only incurred an expenditure of $30,000.00, Cores' full policy limits. By its failure to act in accordance with its contractual obligations, ACM unintentionally "removed the lid," the $30,000 policy limit, from the policy and exposed QBE to multiple millions of dollars for settlement of several related cases, as well as related litigation expenses.

QBE ultimately paid $15,000,000.00 to resolve the Cortes and Cardonas claims. All but $30,000.00[11] of this payment was required because of ACM's breach.

QBE was also forced to engage counsel and incur costs in addressing the excess claims.  None of these fees and costs would have been required had the policy limits demand been timely honored. In April 2017, the parties entered into a stipulation in this proceeding wherein they agreed that the total amount of attorney's fees and costs incurred by QBE in connection with the Cardona claim and subsequent litigation (not including fees associated with the pursuit of this arbitration) were in the total amount of $1,352,703.73.

All of those fees were the direct result of ACM's failure to resolve the claim within policy limits. There was no evidence offered at the hearing that the rates were unreasonable or that the work itself was excessive or unnecessary. ACM stipulated that these amounts were reasonable.

In that same April 2017 stipulation, it was agreed that QBE's attorney's fees in this arbitration, excluding costs, totaled $475,962.00. ACM offered no evidence or argument at the hearing that the rates were unreasonable or that the work itself was excessive or unnecessary.

---

[11] During oral argument on June 9, 2017, in response to a question from the Panel, counsel were uncertain whether QEB's $30,000.00 obligation on the Cortes policy had been netted out or otherwise accounted for in QBE's damages calculations. Counsel stipulated that any award in favor of QBE would be adjusted in good faith to reflect that credit if it is determined that it has not previously been accounted for. [June 9, 2017 transcript, p. 116]

**QBE v. ACM Final Award**
July 24, 2017
Page **20** of **23**

All of the settlement costs and attorney's fees (and costs incurred in connection with the Cardona claim) were the direct result of ACM's breach of the Agreement both at the time of its failure to resolve the claim and in its conduct following the commencement of litigation. In order to make QBE whole and otherwise compensate for its loss by placing it in the same position it would have enjoyed if ACM had not breached the CMA, the Panel awards QBE all of the foregoing items of compensatory damage, including its attorney's fees and costs in this arbitration, in accordance with the indemnity provision of the Agreement.

And while the arbitration clause of the CMA does not provide for the recovery of attorney's fees in arbitration, those fees and costs are covered by the indemnification clause, which obligates ACM to pay all of QBE's "costs and expenses (including attorney's fees)" "arising out of or in connection with" ACM's deficient performance under the CMA. We therefore award QBE its attorney's fees and costs incurred in this proceeding, excluding its arbitrator fees and arbitration costs, for which each side agreed to be responsible itself under the arbitration agreement. Ex. 1, paragraph V (3).

The parties stipulated that, through March 2017, arbitration-related attorney's fees were $475,962.00 plus interest of $20,526. *(See* Appendix B: Interest on Arbitration-Related Fees.) Since then QBE has incurred an additional $193,606 in attorneys' fees. QBE is entitled to its arbitration-related fees because, in the CMA, "ACM agree[d] to indemnify, defend, and hold [QBE] harmless from and against any and all claims, demands, actions, proceedings, losses, damages, *costs and expenses (including attorneys' fees),* and regulatory fines or charges, made or instituted against, or incurred by [QBE] and arising out of or in connection with any negligence or deficiency of performance hereunder by ACM." (Ex. 1, p. 8, § S(l) [emphasis added].)

## 2. Interest

Interest on the $15,000,000.00 settlement payment from July 2016, when paid, through May 26, 2017 totals $1,327,397.00.

By stipulation of the parties dated May 3 and 4, 2017, the interest on the attorney's fees incurred in the Cardona matter through May 26, 2017 totals $80,661.00.

During the course of the June 9, 2017 oral argument, counsel for QBE agreed to cut off its attorney's fees, and the interest thereon, as of May 26, 2017.

By submitting its monthly attorney's fee invoices, QBE inferentially asserts that the rendering of any given month's attorney's fees invoice entitles it to interest on that fixed sum. In Appendix B to its Opening Post-Hearing Brief, QBE requests interest on attorney's fees incurred in pursuing this arbitration. Interest on the attorney's fees incurred through March 2017, $475,962, is $20,526. (See Appendix B: Interest on Arbitration-Related Fees.)

**QBE v. ACM Final Award**
July 24, 2017
Page 21 of 23

AWARD:

1. Respondent ACM shall pay to Claimant QBE the following sums:

   a.   $15,000,000.00 (settlement payment)
   b.   $1,327,397.00 (interest on settlement payment);
   c.   $1,352,703.73 (attorney's fees and costs on Cardona claim);
   d.   $80,661.00 (interest on Cardona claim fees and costs);
   e.   $475, 962.00 (fees in connection with arbitration);
   f.   $20,526 Interest on arbitration-related attorney's fees; and
   g.   $193,606.00 (final fees in connection with arbitration),

   for a total of $ 18,450,855.73.

2. Claimant shall take nothing on any of its other claims.
3. Each party shall bear its own arbitration fees and expenses as incurred in this proceeding.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Dated:  July 24, 2017

_D. Rothman_
Deborah Rothman, Esq., Arbitrator
Chair

**QBE v. ACM Final Award**
July 24, 2017
Page 22 of 23

Hon. Rex Heeseman (Ret.), Arbitrator

QBE v. ACM Final Award
July 24, 2017
Page 23 of 23

Michael Weaver, Esq., Arbitrator

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: QBE Insurance Corp. vs. American Claims Management, Inc.
Reference No. 1220052252

I, Jenny Truex, not a party to the within action, hereby declare that on July 24, 2017, I served the

attached FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof

enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Diego,

CALIFORNIA, addressed as follows:

Alan J. Hart Esq.
Lawrence Borys Esq.
Stephen J. Erigero Esq.
Ropers, Majeski, Kohn & Bentley
445 S. Figueroa St.
Suite 3000
Los Angeles, CA  90071
Phone: 213-312-2000
ahart@rmkb.com
LBorys@rmkb.com
serigero@rmkb.com
    Parties Represented:
    American Claims Management, Inc.

Paul S. White Esq.
Jeanne K. Riggins Esq.
Tressler LLP
1901 Avenue of the Stars
Suite 450
Los Angeles, CA  90067-3283
Phone: 310-203-4800
pwhite@tsmp.com
jriggins@tresslerllp.com
    Parties Represented:
    QBE Insurance

Peter H. Klee Esq.
Mark J. Feldman Esq.
Sheppard Mullin Richter & Hampton LLP
501 W. Broadway
19th Floor
San Diego, CA  92101
Phone: 619-338-6500
pklee@sheppardmullin.com
mfeldman@sheppardmullin.com
    Parties Represented:
    QBE Insurance

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Diego,

CALIFORNIA on July 24, 2017.

Jenny Truex
jtruex@jamsadr.com